IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  *Plaintiff*,<br>v.<br><br>JEFFREY DAVID PIERCE,<br><br>  *Defendant*. | Case No. 20-40068 |

## MOTION TO SUPPRESS

Police must execute a search warrant strictly within the bounds its sets. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 394 n. 7, 91 S.Ct. 1999 (1971). Accordingly, when the FBI requests and obtains a warrant that prohibits the executing officers from compelling production of the passcode necessary to unlock a cellular phone, such a restriction cannot be ignored. But that is precisely what occurred in this case. On September 2, 2020, in direct contravention of the search protocols proposed to and approved by Magistrate Judge Angel Mitchell, FBI agents told Jeffrey Pierce a warrant required him provide the passcodes to his phones. This misrepresentation of the actual terms of the warrant was no better than claiming to have a warrant when there was none at all. *See Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788 (1968).

Pierce moves this Court to suppress all evidence obtained as a result of this Fourth Amendment violation, specifically including the content of his phones and the statements he made to police while they searched his phones.

## MEMORANDUM IN SUPPORT

### September 1, 2020: The search warrant application and issuance

On September 1, 2020, FBI Agent Justin Broxterman presented a lengthy search warrant application to Magistrate Judge Angel Mitchell. The application, exhibits, and affidavit total 164 pages. Exhibit 101.

In addition to detailing the FBI's investigation into a person soliciting images of minors in the Topeka area, the affidavit discussed—at great length—the issues associated with seizing and searching computers and smartphones for evidence. Beginning with paragraph 8, the affidavit set out various issues related to the seizure and search of computers and smart phones. One issue specifically addressed was gaining access to the information stored on electronic devices such as smartphones.

Paragraph 12 requested authority "to compel the owners to unlock any devices requiring biometric access subject to seizure pursuant to this warrant." Paragraph 12(f) explained: "The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices…."

Following Paragraph 12(g), which acknowledged that there are circumstances where biometrics would not unlock a device and even identified specific examples of when this might occur, Paragraph 12(h) set out a precise protocol that the FBI proposed for accessing and searching smartphone data:

> h. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of the device owner to the fingerprint scanner of the devices found at the PREMISES; (2) hold the devices found at PREMISES in front of the face of the owners face and activate the facial recognition feature; and/or (3) hold the devices found at the PREMISES in front of the face of the owner and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. **The proposed warrant does not authorize law enforcement to compel that the device owner <u>state or otherwise provide</u> the password or any other means that may be used to unlock or access the devices.**

Exhibit 101 at 22 (emphasis added).

Judge Mitchell granted Agent Broxterman's request and issued the warrant. The warrant Judge Mitchell issued authorized law enforcement to seize "[c]ellular telephones, smart phones, [and] wireless phones" to search those phones "**in accordance with the procedures set forth in the affidavit submitted in support of this warrant**." Exhibit 102, Attachment B, p. 1 & p. 5 ¶ 19 (emphasis added).

### September 2, 2020: Execution of the warrant

On September 2, 2020, FBI agents arrived at Jeffrey Pierce's residence to execute the warrant. At the same time, a second team of agents stopped Mr. Pierce as he drove to work.

After Pierce was stopped, Task Force Officer David Albers and Special Agent Ashley Davis spoke with him in an FBI vehicle. Albers immediately asked Pierce to provide the passcode to his phone. Citing the Fourth Amendment to the United States Constitution, Pierce unequivocally declined to do so unless "forced":

3

| | |
|---|---|
| Albers: | Okay. All right. So, um, I did notice that you have, uh, a phone with you, right? |
| Pierce: | Mm-hmm. |
| Albers: | Okay. Um, what's the...what's the passcode on that phone? |
| Pierce: | I don't think I'll give that out unless I'm forced to on something obviously. |
| Albers: | Okay, yeah, just, uh, just so I kinda know where you're coming from, what's the...what's the reasoning? |
| Pierce: | Well, first of all, Fourth Amendment would be the big one. |
| Albers: | Okay. |
| Pierce: | That nobody can just go through any of my property without proper due process would be number one. |
| Albers: | Sure. Okay. Uh, any...any other concerns or... |
| Pierce: | No. |
| Albers: | So, just the...the Fourth Amendment? |
| Pierce: | Yeah. |

Exhibit 103, Interview of Jeff Pierce 9-2-2020, at 6-7. Albers responded by stating that a search warrant provided valid "legal process" for his request:

> Um, as...as...as far as your...your phone, um, uh, you know, we will have to take a look at it, based on some information that...that we've received. So, whether you wanna give us the passcode or...or we obtain it, um, through a different way, it...it's up to you, but, um, a little cooperation goes a long way. **Um, you were worried about the Fourth Amendment, the...and the search warrant does cover your...your phone, so there is legal...legal process with that, okay?**

Ex. 103, at 10 (emphasis added).

Soon after, Task Force Officer Chris Moore arrived at the door of the car where Pierce sat talking with Albers and Davis. Moore opened the door, advised that the warrant authorized him to use Pierce's face to unlock his cell phone through facial recognition and, when that effort failed, demanded that Pierce provide his passcode:

| | |
|---|---|
| Albers: | He's gonna open the door. |
| Pierce: | Yeah. |
| Albers: | Okay. All right. |
| Moore: | Hi there. I don't know if you noticed on the warrant but it |

4

|         |                                                                                                                                                                                                                                                                                                          |
|---------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|         | does include your biometrics.                                                                                                                                                                                                                                                                            |
| Pierce: | Okay.                                                                                                                                                                                                                                                                                                    |
| Moore:  | So, that which...basically what that means is we can use your facial recognition to get into the phone, okay? So that's what we're gonna go ahead and do. Okay. Now, on your phone...                                                                                                                    |
| Pierce: | It doesn't...it doesn't always work to where it's...                                                                                                                                                                                                                                                     |
| Moore:  | Okay. Listen. Okay, I...I do this for a living so I know that after a certain time goes by, you have to enter your passcode to enable facial recognition, okay? So, I...I know you know your password, okay. I...I really don't wanna make...                                                            |

Ex. 103 at 11. Pierce requested confirmation from Albers and Davis that Moore was accurately representing the reach of the warrant, and they confirmed that he was:

|         |                                                                                             |
|---------|---------------------------------------------------------------------------------------------|
| Pierce: | So, a search warrant on a phone isn't a separate thing. It's on that search warrant?        |
| Davis:  | Yes, it's on the search.                                                                    |
| Albers: | Yeah, the search warrant is covering everything including...including your cars.            |
| Pierce: | Yeah, I already saw the thing about the cars.                                               |
| Albers: | Yeah.                                                                                       |
| Pierce: | Okay.                                                                                       |

Ex. 103 at 12.

So, when Moore again insisted that Pierce provide his passcode to enable facial recognition, Pierce complied:

|         |                                                                                                                      |
|---------|----------------------------------------------------------------------------------------------------------------------|
| Male:   | All right. So, what...what is your passcode for this phone so we can speed this along a little bit?                  |
| Pierce: | I'll put my face on it. I...I usually use my face. I...                                                              |
| [Crosstalk 00:16:23] |                                                                                                         |
| Pierce: | ...about that.                                                                                                       |
| Male:   | Well, what I'm saying is...                                                                                          |
| Pierce: | ...here, swipe up.                                                                                                   |
| Male:   | ...it's...you've got it to where you have to put the passcode in to enable your face. Okay? So, I know you know the passcode to this phone. |
| [00:16:37] |                                                                                                                   |

5

| | |
|---|---|
| Pierce: | Well, I... It's either one of two things. |

[Crosstalk 00:16:39]

| | |
|---|---|
| Male: | Go ahead and type it in. |
| Pierce: | There you go. |
| Male: | Okay. Thank you. |

[Crosstalk 00:16:48]

| | |
|---|---|
| Albers: | And what was that? |
| Male: | So, 1-1-1-6? |
| Albers: | Yeah. |
| Pierce: | Yeah. That was the last one I tried. |

Ex. 103 at 12-13. And Pierce did the same for another phone discovered in his car. Ex. 103 at 139.

Immediately after Pierce unlocked the phone, Albers cited Moore's access to the information stored on that phone as a reason for Pierce to talk:

> Um, huh, obviously, he's...he's starting to...to look at your phone, um, what...what is on the phone that...that you think we would, uh, be interested in as...as it relates to, uh, child exploitation matters?

Ex 103 at 14. Albers and Davis made sure Pierce knew that, as they were questioning him, Moore was feeding them information about the contents of his phone, stating:

| | |
|---|---|
| Albers: | ...on those sites? Okay. Um, so, if we, um, since he's on...on your phone right now, um... |
| Davis: | He's, well, so there's a photo vault so we need the passcode to the photo vault. |
| . . . | |
| Davis: | He says that the [photo vault] passcode's not working. |

Ex. 103 at 21-22.

The agents began to engage Pierce about the accounts on his phone, specifically delving into his Instagram activity. Pierce admitted he used Instagram to communicate with people and that he sometimes used false names online. But he

6

did not disclose the account name or any specifics—not until Davis confronted Pierce with screenshots Moore was forwarding as he searched the phone Pierce had unlocked with the passcode Moore demanded earlier:

> Davis: You've got a...so Chris actually has a image from your phone that he sent, so this is the account addiestrode111.
> Pierce: Oh, yeah.
> Davis: Is that the Instagram account that you're currently using?
> Pierce: Yeah.

Ex 103 at 38.

While Pierce continued to talk to the agents, his statements when not confronted with information from the recently unlocked phone were general in nature. For example, he admitted to having sexual conversations online, but he insisted they were anonymous. He denied continued possession of any information exchanged.

Growing frustrated with the lack of detail Pierce was willing to provide, Albers reminded Pierce that, since the FBI now had knowledge of the phone's passcode, it would conduct a forensic examination of the phone's contents—and Pierce would need to explain what agents would ultimately find on it:

> Albers: So, you appreciate the things that you already told us, um. But as I...as I sit here, um, reflecting on some of the things that you mentioned, um, it appears to me that you're still holding back a little bit the, you know, some stuff that you're not real proud of. Uh, you have mentioned some things that...that you aren't proud of, but, um, **I think you're falling short a little bit, um, which is understandable but also a little concerning at the same time, uh, from...from my standpoint. Um, the...the...the forensics aren't going to lie, right? We have capability, especially with the...the iPhones pulling up messages have been**

7

| | |
|---|---|
| | deleted, pictures that have been deleted. Um, we have the capability of obtaining those things other ways as well. |
| Pierce: | I mean, here's the thing. If I did anything on there, none of it was illegal. I'm with people that are of age that are telling me they're of age and I'm sending pictures with them. So, if I'm deleting stuff, yeah, it's because I don't wanna get caught by my wife. |
| Albers: | Which I get, I get that. Um, but again, **the...the forensics are gonna paint a more accurate picture than...than what you're willing to...to tell us. Now, you do have the capability right now to explain**, uh, you know, how, you know, kinda the why. We know...we know when, we know who, we know where, um, you know, we know these things. But we don't...**the only way we're able to...to understand where you're coming from is by you explaining it.** |

Ex 103 at 55-56 (emphasis added). When Pierce asked what it was he was supposed to explain, Davis responded that TFO Chris Moore, who was reviewing the contents of the phone Pierce had just unlocked, had questions:

| | |
|---|---|
| Pierce: | Well then tell me something that you would like me to explain. |
| Albers: | Um... |
| Davis: | Maybe we could discuss what got us here and then Chris has a couple of things. |

Ex. 103 at 56. Davis said that the FBI had knowledge of minors communicating with "an Instagram account for Addie Strode **that you've said you use . . . which is the account that we have on the phone**." Ex. 103 at 56. And Albers followed this by again emphasizing the FBI now had the capability to run forensics on the phone Pierce had just unlocked:

> I get the feeling that you wanna talk about it, you wanna explain it, but for whatever reason, you're...you're hesitant. That's not going to be helpful at all. Um, like I said, the...**the forensics are going to paint an accurate picture**, um, of when it started and what was said, but we can't

8

> get into your mind and figure out, you know, what. Or are we just supposed to assume the very worst? Because you're not wanting to...

Ex 103 at 57 (emphasis added).

It was after this point in the conversation that the agents began to ask, and Pierce began to answer, about specific individuals and specific communications. Throughout the conversation Davis confronted Pierce with information from the phone he had unlocked, like noting: "It looks like you were chatting on Instagram this morning." Ex. 103 at 94. And Pierce acknowledged awareness that Moore was assisting Albers and Davis as they questioned him—at one point even saying, "I know that guy can hear me right now." Ex 103 at 125.

## Arguments & Authorities

The Fourth Amendment to the United States Constitution, made applicable to the states by way of the Fourteenth Amendment, provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

When a warrant issues, it controls the scope of the intrusion law enforcement officers may make. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 394 n. 7. If officers disregard or misrepresent the scope of their authority under the warrant, the fruits of their misconduct must be suppressed from evidence. *Bumper v. North Carolina*, 391 U.S. 543, 550. Here, these rules dictate

9

suppression of: (1) the content of Pierce's phones; and (2) Pierce's interrogation statements.

I. **The warrant contained an explicit restriction designed to protect Pierce's Fifth Amendment right against self-incrimination.**

The Fifth Amendment right against self-incrimination protects an accused from being forced to provide the government with even a link in the chain of evidence needed for prosecution. *See Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814 (1951). It has been held that production of an unlocked smartphone or a passcode to an locked smartphone (verbal or otherwise) is a protected testimonial communication because giving law enforcement an unlocked smartphone or a passcode to unlock a smartphone communicates, at a minimum, that: "(1) the suspect knows the password; (2) the files on the device exist; and (3) the suspect possesses those files." *Eunjoo Seo v. State*, 148 N.E.3d 952, 955 (2020). The communicative aspects of the production fall within the Fifth Amendment's protection. *Id.* at 957-958; *see also Commonwealth v. Davis*, 220 A.3d 534, 548 (Pa. 2019); *In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1335, 1346 (11th Cir. 2012); *United States v. Kirschner*, 823 F.Supp.2d 665 (E.D. Mich. 2010).

Mindful of this case law, Agent Broxterman's affidavit proposed that law enforcement be prohibited from accessing and searching the contents of Pierce's phones by compelling him to "state or otherwise provide" his passcode:

> The proposed warrant does not authorize law enforcement to compel that the device owner state or otherwise provide the password or any other means that may be used to unlock or access the devices.

10

Ex. 101 at 19-22. And Judge Mitchell's warrant specifically adopted these restrictions—authorizing law enforcement officers to seize and search "[c]ellular telephones, smart phones, [and] wireless phones," <u>but only "in accordance with the procedures set forth in the affidavit submitted in support of th[e] warrant</u>." Exhibit 102, Attachment B, p. 1 & p. 5 ¶ 19.

## II. Agents commanded Pierce to provide the passcodes to his phones, claiming authority under the warrant that specifically prohibited their demands.

Knowing the limitations imposed by the warrant, the agents' aim was the consent exception to the warrant requirement. But their execution failed. When Pierce expressly asserted his constitutional rights and stated he would not provide his passcode "unless forced" to do so, the agents went too far—representing that the warrant required him to do what he had just refused.

Specifically addressing Pierce's statements that "the Fourth Amendment" and "due process" protected him against disclosure of his passcode, Albers told Pierce:

> Um, you were worried about the Fourth Amendment, the...and the search warrant does cover your...your phone, so there is legal...legal process with that, okay?

Ex 103 at 10. Then, when Moore informed Pierce that the warrant specifically authorized him to use facial recognition to get into the phone, he did not just omit that the warrant forbade him from compelling Pierce's passcode. He utterly contradicted that restriction, telling Pierce: "you have to enter your passcode to enable facial recognition, okay?" *Id.* at 11. When Pierce reacted to Moore's statement by asking Albers and Davis whether Moore was accurately representing the reach of

11

the warrant, they confirmed "the search warrant is covering everything." *Id.* at 12. So, when Moore again insisted, "Go ahead and type it in," Pierce typed in his passcode and confirmed it verbally. *Id.* at 13. Having been told this was all required by the warrant, Pierce similarly complied when asked the passcode to another phone. *Id.* at 139.

When the agents misrepresented their authority to command access to the contents of Pierce's phone, they created a situation in which it became impossible for Pierce to offer this passcode consensually. That conclusion is inescapable following the United States Supreme Court's decision in *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788 (1968).

In *Bumper*, several officers arrived at the petitioner's house and informed his grandmother they had a warrant to search the residence. *Id.* at 546. Because she responded to this announcement by saying "go ahead" and opening the door, the state claimed the subsequent search was justified on the basis of consent. *Id.* On review, the Supreme Court considered "whether a search can be justified as lawful on the basis of consent when that 'consent' has been given only after the official conducting the search has asserted that he possesses a warrant." *Id.* at 548. No, said the high court. "[T]here can be no consent under such circumstances." *Id.* It explained:

> When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the State does not even

12

> attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all.
>
> When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.

391 U.S. 543, 548-550, 88 S.Ct. 1788 (1968).

The agents portrayed that a warrant expressly prohibiting the compelled production of Pierce's passcodes actually required him to provide them. The result was an unlawful entry into Pierce's phones. Such a deceitful invasion of Pierce's privacy is equally as unconstitutional as the search of a home into which an officer gains entry by falsely claiming a warrant sanctions his presence.

### III. The fruits of the agent's unlawful conduct must be suppressed.

The exclusionary rule prohibits the use of evidence acquired as a direct result of the police misconduct by the agents (here: the contents of the phones). *See Bumper*, 391 U.S. at 550. It also prohibits the government from using the indirect products of the agents' unconstitutional invasion of Pierce's private property:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.

*Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407 (1963).

Especially important here is that "verbal evidence which derives so immediately from an unlawful entry a . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." *Wong Sun,* 371 U.S. at 485. Whether an accused statements were derived from the "primary illegality"

13

depends on whether they have been "come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488.

In this case, Pierce's incriminating statements were unquestionably "come at" by exploitation of the agents' illegal search of his phone. Albers and Davis cited Moore's access to the information stored on Pierce's unlocked phone as a reason for Pierce to talk. Albers emphasized that law enforcement's access to the phone's contents would allow additional forensic searches down the line. And Davis used specific information Moore found on the phone during the interrogation to press Pierce to admit to control of a specific Instagram handle of interest. When Pierce was still reluctant to talk about specifics and had yet to admit to any of the exchanges underlying his charges, Davis pressed that angle harder—stating that the FBI had knowledge of minors communicating with "an Instagram account for Addie Strode that you've said you use . . . which is the account that we have on the phone." Only when specifically confronted with incriminating information from his unlocked phone—and the inevitability of obtaining additional data now that law enforcement the passcode to unlock at their whims—did Pierce make incriminating statements.

Pierce's interrogation statements were inextricably intertwined with the illegal search of his phone. He only veered from generalities and denials when confronted with the contents of his unlocked phone and the ability for law enforcement to forensically mine his phone for additional data—all made possible

14

because the agents unlawfully compelled him to disclose his passcodes. These fruits of the agents' unlawful conduct must be suppressed. *Wong Sun*, 371 U.S. at 484-485.

## Conclusion

The warrant requirement protects privacy interests by assuring citizens subject to a search that such intrusions are not the random or arbitrary acts of government agents, but narrowly defined intrusions authorized by law and limited their objectives and scope. *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 621–22, 109 S. Ct. 1402 (1989). By misrepresenting the scope and authority of the warrant they were entrusted to execute, the agents undermined an essential purpose of the warrant requirement. *See id.* In order to make effective the fundamental guarantees of the Fourth Amendment, evidence obtained as a result of this misconduct must be excluded from trial. *Wong Sun*, 371 U.S. at 484-485.

      Respectfully submitted,

      Joseph, Hollander & Craft LLC
      *Attorneys for the Defendant*

By:   s/ Christopher M. Joseph
      Christopher M. Joseph, #19778
      1508 S.W. Topeka Blvd.
      Topeka, Kansas 66612
      (785) 234-3272
      (785) 234-3610 fax
      cjoseph@josephhollander.com

## CERTIFICATE OF SERVICE

      I hereby certify that on February 1, 2020, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

                                                  s/ Christopher M. Joseph
                                                  Christopher M. Joseph