**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) Case No. **20-CR-40068-HLT-ADM** |
| | ) |
| **JEFFREY PIERCE**, | ) |
| *Defendant.* | ) |

**GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION
TO SUPPRESS MIRANDIZED STATEMENTS AND EVIDENCE FROM IPHONES**

As alleged, defendant Jeffrey Pierce is a highly educated and sophisticated high school teacher who led a double life. This double life included the defendant blackmailing minor boys into providing images of their genitalia and of them engaging sexual acts. This also included the defendant targeting boys at the very high school where he worked. As a result, a grand jury in this District returned a superseding indictment against the defendant for production of child pornography in violation of 18 U.S.C. § 2251 (Counts One through Nine), distribution of child pornography in violation of 18 U.S.C. §2252 (Count Ten), possession of child pornography in violation of 18 U.S.C. §2252 (Count Eleven), and coercion and enticement of a minor in violation of 18 U.S.C. § 2422(b) (Count Twelve). Currently before the Court is the defendant's motion to suppress significant amounts of child exploitation evidence law enforcement obtained during a post-*Miranda* voluntary interview and located on the defendant's two iPhones. (ECF 25). More specifically, the defendant asserts that agents (allegedly) misrepresented their authority under the search warrant, and thus he did not "consensually" provide his simple four-digit passcode, which could open (decrypt) his two iPhones. As a result, the defendant requests that this Court suppress all of his statements and the contents of his iPhones.

1

The defendant's motion is both factually[1] and legally unsupported. As explained below, the defendant's iPhones were seized pursuant to a lawful search warrant. Neither the purpose nor the plain language of the warrant's biometric instructions was meant to interfere with law enforcement's ability to conduct a voluntary interview of the defendant. Further, after being provided *Miranda* warnings (given out of an abundance of caution), the defendant knowingly, voluntarily, and intelligently provided a written waiver of his rights and agreed to speak with law enforcement. During his consensual interview, the defendant asked thoughtful questions demonstrating his intelligence, law enforcement *truthfully and accurately* described the search warrant to him, and he examined the warrant for himself. Under those circumstances, neither the Fifth Amendment nor the search warrant prevented law enforcement from asking the defendant to provide his passcodes and using the passcodes provided to open his iPhones.

But even were the Court to conclude law enforcement technically violated the search warrant's provisions or the defendant's Fifth Amendment rights, the exclusionary rule would not apply for at least four reasons. First, law enforcement had an *independent source*. At the same time the defendant provided his simple four-digit passcode, his wife also independently provided it to law enforcement during a voluntary interview. Second, it was an *inevitable discovery* that law enforcement would have opened/decrypted the defendant's two iPhones because (1) the four-digit passcode was so simple law enforcement's extremely sophisticated software would have opened/decrypted them; and (2) law enforcement's use of a passcode bank—a collection of possible passcodes associated with an individual suspect's life—would have yielded the simple four-digit passcode because that code was the last four digits of the defendant's own cell phone

---

[1] The government notes that the defendant's recitation of the facts omits key portions of what occurred during the defendant's interview, which was audio recorded.

number and the defendant's wife had already provided it to law enforcement during her interview. Third, law enforcement's actions were in *good faith* as the plain language of the warrant's instructions did not preclude a voluntary interview of the defendant or asking him about his passcode during that interview. Fourth, the defendant's statements and the contents of his iPhones were *not tainted by any fruit of the poisonous tree*. Even if the defendant had not provided law enforcement with his passcodes, nearly all of the questions law enforcement asked the defendant during his interview would have been the same. Law enforcement already had the majority of the information used to question the defendant—and, unlike the defendant suggests, it was not learned in real-time by examining the defendant's iPhones during the interview. Because the defendant's statements as to his iPhone passcodes were given voluntarily, the contents of the defendant's iPhones are admissible as the physical fruit of those voluntary statements in accordance with applicable Supreme Court case law.

The defendant's conclusory assertions that the government violated his Fifth Amendment rights and the search warrant are without support in the case law. Instead, what the full record establishes is that the defendant's rights were not violated. But even if they technically were, the defendant's statements and the contents of his iPhones are still admissible. Accordingly, the Court should deny his motion.

## STATEMENT OF FACTS

### A.    Initial Disclosure

On June 5, 2020, an agent from the Federal Bureau of Investigations (FBI) spoke with a mother (Witness 1) over the phone. (*See* **Gov't Exhibit 1; Residential, Vehicle, and Person Search Warrant**). Witness 1 advised that her 14-year-old son, had been contacted by an unknown individual on Instagram using account "Addie8651." Because her son did not

recognize the individual or the account, he did not respond. The user of the account was portraying themselves as a 14 to 15-year-old female and soliciting sexually explicit images from minors. Both Witness 1 and her son believed the Instagram account was fake. Witness 1's son later learned that two of his minor friends had also been contacted by the same Instagram account. One of the friends disclosed that he took and sent sexually explicit images of himself to the Addie8651 Instagram account and that the user of the account threatened to post or distribute the images he already had of the minor if he did not send additional sexually explicit images. Witness 1's son informed Witness 1 of his friend's situation, and Witness 1 advised that the minor tell his parents what was going on.

Upon being made aware of minor's situation, Witness 1 located and viewed the publicly available information for the Addie8651 account. Witness 1 observed the user of the Instagram account was "friends" with or was being "followed" by approximately 1900 other Instagram users. Witness 1 confirmed most of the "friends/followers" appeared to be juvenile males. While reviewing the list of friends and followers, Witness 1 observed the name and Instagram accounts of numerous juvenile males whom she recognized as residing in the Topeka, Kansas area.

On June 8, 2020, the FBI interviewed the minor about the Addie8651 Instagram communications. The minor stated the Addie8651 account portrayed themselves as a 16-year-old female living in Kansas City, Kansas and that the user was friends with, or was being followed by, other minors that the he knew personally. The minor confirmed he sent nude images of his penis and buttocks to the Addie8651 Instagram account. The account also requested a video of the minor masturbating. The minor complied and sent the requested video to the user. At the time the minor sent the images and video to the account he was 14 years old. The Addie8651 account told the minor they were exchanging pictures with other users as well. The minor also disclosed

the user sent him a video of a female masturbating with a comb and other images of females, including a picture of a female's vagina. The minor confirmed that once he declined to send additional sexually explicit images to the Addie8651 account, the user threatened to post or distribute the images the user already had of him. After confiding in his parents, the minor's mother, Witness 2, reviewed the Addie8651 Instagram account. She recognized numerous Instagram accounts that appeared to belong to other minors around her son's age and who lived in the Topeka, Kansas area, who were friends with or following the account.

**B.    Instagram Search Warrants for the Addie8651 Account**

After receiving the above information, FBI Task Force Officer (TFO) Justin Broxterman drafted a search warrant for the contents of the Addie8651 Instagram account. On July 23, 2020, the Honorable Angel D. Mitchell of the United States District Court, District of Kansas, signed a federal search warrant for the Instagram account Addie8651. (**Gov't Exhibit 2, Instagram Search Warrant; 20-mj-5066**). Based on the information provided by the above witnesses, this warrant specifically sought the data and information contained within the Instagram account from March 8, 2020 through June 5, 2020 (the timeframe in which the minor communicated with the account and sent sexually explicit content of himself).

On July 24, 2020, Instagram responded to the search warrant.[2] The company provided the requested data and records for Instagram account Addie8651. This included, but was not limited to: account identifiers; IP address information for the account user; account creation information; accounts the user was "following"; accounts that were "following" the user; the account's profile photograph, images, and videos; and Instagram messages between the account

---

[2] The response has not been provided as an exhibit to this motion as it contains contraband.

and other Instagram users during the requested time period.  The account information provided by Instagram contained a registration IP address, along with many other IP addresses used and a verified phone number of 785-220-1116. (*See* **Gov't Exhibit 3, Sworn Affidavit of FBI TFO Justin Broxterman**). The company explained that for a user to "verify" a phone number, they must have responded to a text message sent to the listed number.  The records showed the current username on the account was Addiestrode111, but that a previous username of Addie8651 had been used.

A review of the messages from the Addie8651 Instagram account for the time period of March 8, 2020 through June 5, 2020, revealed communications between the account user and multiple minors wherein the account user solicited the minors to produce sexually explicit images and videos of themselves. Based on the content of the communications, it appeared this account was used prior to the date of March 8, 2020 to engage in the same type of conduct. Therefore, TFO Broxterman applied for a second search warrant for the same Instagram account for the contents of the account from the creation of the account to the date the search warrant was signed. On September 1, 2020, the Honorable Angel D. Mitchell of the United States District Court, District of Kansas, signed a second federal search warrant for the Instagram account from the creation of the account through September 1, 2020. On September 2, 2020, Instagram responded to the search warrant.  The company provided the requested data and records for the full Instagram account.  The records revealed the account was mainly used to solicit sexually explicit images and videos from minor males.

### C. Subpoenas Issued to AT&T and Comcast

TFO Broxterman served subpoenas on AT&T for information related to the verified phone number of 785-220-1116 and on Cox Communications for information related to IP

addresses provided by Instagram. Both companies provided information linking the IP addresses and phone number to Jeffrey D. Pierce with a home address of 4321 SE Violet Court, Topeka, KS 66609. (**Gov't Exhibit 3**).

> ### D. Residential, Vehicle and Person Search Warrant

After reviewing the first Instagram search warrant return showing the Addie8651/Addiestrode111 account was mainly used to solicit sexually explicit images and videos from minor boys and after obtaining information linking the account to Jeffrey Pierce, a residential, vehicle and person search warrant was sought by TFO Broxterman. (***See* Gov't Exhibit 1**). Contained within the search warrant was a provision seeking approval for law enforcement to utilize an individual's biometrics (fingerprint, facial recognition, or iris recognition) to unlock any digital device. The first paragraph of the search warrant discussing biometrics stated, "[t]his warrant permits the FBI to *compel* the owners to unlock any devices requiring biometric access subject to seizure pursuant to this warrant." (**Gov't Exhibit 1, ¶ 12**) (emphasis added). The last sentence of the paragraph discussing biometrics stated:

> The proposed warrant does not authorize law enforcement to *compel* that the device owner state or otherwise provide the password or any other means that may be used to unlock or access the devices.

(**Gov't Exhibit 1, ¶ 12(h)**)) (emphasis added). On September 1, 2020, the Honorable Angel D. Mitchell, US Magistrate Judge, in the United States District Court for the District of Kansas, signed the search warrant for Pierce's person, residence located at 4321 SE Violet Ct. Topeka, Kansas 66609, and vehicles to search and seize evidence relating to violations of 18 U.S.C. §§ 2251, 2252 and 2252A (child exploitation offenses), including digital media.

### E.    Pre-search Briefings Where Evidence Already Known Is Discussed

On September 1, 2020, TFO Broxterman led a pre-search briefing in anticipation of executing the search warrant the following morning on Pierce's residence, vehicles, and person. All participants of the pre-search briefing were provided with background information on the investigation, safety precautions that would be taken, and assigned roles for the execution of the search warrant. FBI Special Agent (SA) Ashley Davis and FBI TFO David Albers of the Kansas City FBI office were assigned to interview Pierce. Prior to the pre-search briefing, TFO Broxterman provided SA Davis with a six-page document consisting of information previously obtained pertaining to the investigation into Pierce. (**Gov't Exhibits 4, Pre-Search Brief Information Packet; 5, Sworn Affidavit of SA Ashley Davis**). SA Davis and TFO Albers reviewed this document while attending the pre-search briefing via phone from Kansas City on September 1, 2020.

On the morning of September 2, 2020, TFO Broxterman held a second pre-search briefing where he provided information packets to many of the agents that were involved in the execution of the search warrant. SA Davis and TFO Albers were provided with a folder containing a printed copy of the previously provided six-page document, ten images believed to be associated with Pierce's Instagram account, and a copy of the search warrant.[3] (**Gov't Exhibits 1, 4, and 6, Images Associated with Pierce's Instagram Account**).

The information contained within the six-page document provided to and reviewed by SA Davis and TFO Albers consisted of the following:

---

[3] The images provided to SA Davis and TFO Albers from TFO Broxterman were sanitized images used by the Addie8651 Instagram account during the exchange of messages with other users.

- Personal background information on Pierce and his family, such as their address, dates of birth, and current employment.

- Pierce's current employment as a teacher at Seaman High School, one of the school's basketball coaches, and prior employment at Washburn Rural High School.

- Subscriber information provided by Instagram for account Addie8651, such as the user and vanity name of Addie8651 and Addiestrode111, registration date and IP address on the account, and verified phone number of 785-220-1116.

- Identifying information provided by the user of the Addie8651 account contained within the Instagram messages, such as the user's name of "Addie Strode" who claimed to be 16-17 years old with a date of birth of April 28, 2003 from Kansas City and who was a Sophomore at Blue Springs High School.

- Description of the publicly available images tied to the Addie8651 account which depicted a female playing softball and a close-up face shot of a young blond female.

- Information about the contents of the Instagram messages between the Addie8651 account and other accounts, such as all the messages are centered around the production or attempted production of child pornography with mainly high school boys, many of which appear to be involved in athletics; the images requested specifically focus on the minors' anus, pubes, penis, and buttocks; the user asking for video and images with the minors' faces visible; the user asking for videos of minors masturbating and ejaculating and the user wanting the minors' full face and body in the videos; the user discussing being interested in males who are

homosexual or curious; the user asking minors if they compare their penis size with other minors, if they have seen other minors naked and if they would touch or engage in sexual acts with other minors; the user screenshotting the images he received as the minors can tell through Instagram and they mention it to the user; the user admitting to taking screenshots of the minors' images, but stating that he then deletes the screenshots because his mother checks his phone; the user asking at least one minor whether he would consider receiving oral sex from another male friend; the user telling this minor that he knows an adult male who is 33 years old and would perform oral sex on the minor; during one series of messages that takes place over a course of several weeks, the user actively tries to convince the minor to meet him in person to engage in sexual acts and this minor is believed to live in Holton, Kansas.

- Information regarding seven specific victims' Instagram accounts to include each username and information about each minor.

- The Instagram name and account number for 37 other Instagram accounts believed to be minors the user communicated with.

- Copies of the images used as the profile picture on the Addie8651 account and sanitized images used by the Addie8651 account during messages.

- IP information provided by Instagram including five AT&T mobility IPs, one Jasper Wireless IP, and 17 Cox Communications IPs.

- Information about the Cox Communication IPs such as all 17 IPs for Cox were associated with the Addie8651 Instagram account activity including sending

sexually explicit images of females to other Instagram users as well as sending produced child pornography from one minor to another minor.

- Subscriber information for the Cox Communication IPs that resolve back to Pierce's home address.

- Pierce's cell phone number of 785-220-1116 and the subscriber data returned from AT&T regarding his phone number.

- That Pierce's cell phone number was currently assigned to an Apple iPhone XS Max cell phone with IMEI 35727709121402, Pierce owned this phone since December 23, 2018, Pierce's cell phone number was previously assigned to an Apple iPhone 5S cell phone with IMEI 01398600068846 and that Pierce owned that phone since at least March 26, 2017.

- Information on the Kik account "jordyreyrey" with a username of Addie Strode that was provided by the user of the Addie8651 account during Instagram messages.

**F.      Execution of the Residential Search Warrant**

On September 2, 2020, at approximately 6:00 a.m., FBI agents conducted surveillance at Pierce's residence located at 4321 S.E. Violet Court, Topeka, Kansas.  At approximately 7:16 a.m., FBI TFO Patrick Salmon observed one of Pierce's vehicles leave the residence. Around 7:20 a.m., FBI agents and TFOs executed the residential search warrant.

The entry team contacted Pierce's wife at the front door of the residence. Present inside the residence was Pierce's wife and three minor children.  Pierce's wife was informed of the search warrant for the residence and vehicles. She was also told that she and her children were free to leave at any time. During the execution of the search warrant, Pierce's wife agreed to

speak with law enforcement. The interview was audio recorded. (**Gov't Exhibit 7, Recorded Interview of Pierce's Wife**).

### G. Interview of Pierce's Wife Where She Provides Pierce's Passcodes of 1116

Law enforcement explained to Pierce's wife the nature of the investigation and the contents of the search warrant. Pierce's wife provided law enforcement with a variety of information including Pierce's cell phone number of 785-220-1116 and his passcode for his iPhone of "1116" which she identified as "just the end of his phone number." (**Gov't Exhibit 7, 14:01 and 14:10**). She confirmed that Pierce's current iPhone model was an XS Max and that Pierce likely had his prior iPhone, though she could not recall the model.

### H. Traffic Stop of Pierce

While simultaneously executing the residential search warrant, law enforcement stopped the vehicle that was seen leaving Pierce's residence a short distance from the house. Pierce was alone in the vehicle. Law enforcement asked Pierce to step out of the vehicle and explained to Pierce they had a search warrant to search his person and vehicle. Law enforcement searched Pierce's person and located an iPhone XS Max in his pants pocket.

### I. Interview of Pierce

#### *Miranda Rights and Written Waiver*

After law enforcement located the iPhone XS Max cell phone, TFO Albers approached Pierce and introduced himself and his partner SA Davis. (**Gov't Exhibits 8, Recorded Interview of Pierce, 02:57; and 9, Transcript of Pierce's Interview, Pg. 3**). TFO Albers asked Pierce whether he was going to be cooperative and Pierce stated "yeah." TFO Albers then informed Pierce that law enforcement had things to share with him and understood that Pierce may also have questions for law enforcement, but that prior to sharing anything with Pierce, he

must explain Pierce's rights. (**Gov't Exhibits 8, 03:37; and 9, Pg. 4**). While utilizing the FBI

Advice of Rights form FD-395, TFO Albers stated the following:

> Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during the questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time. Do you understand those things that I read to you?

Pierce responded, "I do." TFO Albers then asked Pierce to sign the advice of rights form.

(**Gov't Exhibits 8, 04:49; and 9, Pg. 4**). Pierce signed the advice of rights form below the

section stating, "CONSENT" and "I have read this statement of my rights and I understand what

my rights are. At this time, I am willing to answer questions without a lawyer present." The form

was then signed by TFO Albers and SA Davis as witnesses. (**Gov't Exhibit 10, FBI Advice of**

**Rights Form FD-395 Signed by Pierce**).

After receiving and voluntarily waiving his *Miranda* rights, Pierce asked law

enforcement what was taking place at his house. (**Gov't Exhibits 8, 04:57; and 9, Pg. 4**). As the

agents started explaining to Pierce that a search warrant was being executed at his residence,

many of Pierce's neighbors started watching what was going on. It was at this point that SA

Davis asked Pierce if he wanted to sit in the front seat of their unmarked SUV while continuing

to talk. (**Gov't Exhibits 8, 06:06; and 9, Pg. 5**). Pierce agreed and sat down in the front

passenger seat of the vehicle. TFO Albers sat in the driver's seat, and SA Davis sat in the back

seat of the vehicle.

During the entire interview, which lasted approximately 4 hours, both TFO Albers and

SA Davis were dressed in plain clothes, Pierce was not handcuffed, and no weapons were drawn.

The tone from all parties was conversational throughout. No one raised his voice or yelled.

Pierce appeared calm and relaxed during the conversation. Pierce was engaged in the conversation in a sophisticated way. At no time during the interview did Pierce ask to terminate the questioning or ask for an attorney.

After all parties were settled in the vehicle, TFO Albers explained to Pierce they were from the FBI Kansas City office and they investigate things brought to their attention to include things that take place over social media. (**Gov't Exhibits 8, 06:30; and 9, Pg. 6**). TFO Albers further stated that often they already know many things about a situation, but they speak with individuals to get a better understanding of what a particular person is like. TFO Albers asked Pierce whether anything came to mind that may have caused law enforcement to want to speak to him. Pierce responded, "You guys enlighten me." (**Gov't Exhibits 8, 08:06; and 9, Pg. 6**).

### *Exchange Regarding Pierce's iPhone Biometrics and Passcode*

Next, the following exchange took place between TFO Albers and Pierce. (**Gov't Exhibits 8, 08:08-14:41; and 9, Pgs. 6-11**).

TFO Albers: Okay. All right. So, um, I did notice that you have, uh, a phone with you, right?

Pierce: Mm-hmm.

TFO Albers: Okay. Um, what's the...what's the passcode on that phone?

Pierce: I don't think I'll give that out unless I'm forced to on something obviously.

TFO Albers: Okay, yeah, just, uh, just so I kinda know where you're coming from, what's the...what's the reasoning?

Pierce: Well, first of all, Fourth Amendment would be the big one.

TFO Albers: Okay.

Pierce: That nobody can just go through any of my property without proper due process would be number one.

TFO Albers: Sure. Okay. Uh, any...any other concerns or...

| | |
|---|---|
| Pierce: | No. |
| TFO Albers: | So, just the...the Fourth Amendment? |
| Pierce: | Yeah. |
| TFO Albers: | Okay. Um, so... |
| Pierce: | I mean, I hope... I guess on top of that too, nobody ever really showed me a search warrant too. |
| SA Davis: | I've got one right here. |
| TFO Albers: | Yeah. |
| Pierce: | Can you show me, like, what it's all for or... |
| TFO Albers: | Yeah, yeah... |
| Pierce: | I guess just the paperwork so if I'd like to just honestly, I'd like to know, to be honest with you. |
| TFO Albers: | Yeah. You bet. So, I ... I'll give you a second to kind of review that. |
| Pierce: | So, when it says, like, "searching," that's, like, I ... I don't know how any of this works. |
| TFO Albers: | Mm-hmm. |
| Pierce: | Like, you're searching the whole house? All the vehicles? I don't understand what that means. |
| TFO Albers: | Yeah, so, our ... our ... Yeah, our goal is, um, uh, right now it's kinda broad, um, and what we attempt to do is kinda narrow it down because obviously, um, people...other people in the house have...have devices that we may not necessarily need, um, but we don't know that until we talk with people. Um, so, right now, it's kinda broad, but with a little cooperation, we're able to kinda narrow it...narrow it down to the...the specific, uh, items that ... that we may be, uh, in need of. Um, so, yeah, it's ... it's ... it's for the entire house, for all electronic devices, um, uh. What ... what ...what do you guys have in the house? |
| Pierce: | Just my kids have iPads that they have. |

TFO Albers:     Yeah, see, we ... we wouldn't wanna necessarily interrupt ... interrupt their ... their play, uh, if we don't have to. Um, other than iPads, what ... what else is ...

Pierce:         I mean, in the house, that's it. My wife has a phone and there's just a ... each of the kids has an iPad.

TFO Albers:     Okay.

Pierce:         That's it.

TFO Albers:     Any ... any computers at all?

Pierce:         Um, I just have a work computer.

TFO Albers:     Okay.

Pierce:         But it's not at the house.

TFO Albers:     Okay. Uh, in ... in your car or at work?

Pierce:         Um, it should be in a bag in the ... in the car.

TFO Albers:     Okay.

Pierce:         Uh ... Yes, it is. Yeah, it is. I was just trying to think if I brought it home last night or not.

TFO Albers:     Okay. All right. So, you guys don't have a ... a home computer?

Pierce:         No.

TFO Albers:     Work ... work computer, phones, and iPads.

Pierce:         Yeah.

TFO Albers:     Okay. Um, so, that may, uh, it may simplify some things, uh, so we can get done with, uh, everything at the house and get ... get on, uh, on their, you know, everybody's day can get on.

SA Davis:       And ... anybody living at the house besides you, Keelan and the kids?

Pierce:         Nope.

TFO Albers:     How ... how long have you guys lived there?

Pierce:  Um, nine-and-a-half years, maybe. We moved in right before my oldest daughter was born, so she's ... she'll be 10 in February so it's like 9 and a half.

TFO Albers:  Okay. I wasn't sure how... how old this neighborhood was, it seemed fairly new.

Pierce:  The neighborhood's a little bit older than us, but just ...

TFO Albers:  Okay. Okay.

Pierce:  I don't understand any of this right now.

TFO Albers:  All right.

SA Davis:  There will be a copy left for you at the residence so you can definitely take a look at it afterwards too.

Pierce:  Okay.

TFO Albers:  We'll make sure everything...

Pierce:  How long does that take at the house? Because obviously she needs to get to work too, and...

TFO Albers:  Yeah. So, like, I haven't been to the house, I ... I have no idea. So, based on kind of what you're, uh, telling us, you don't have a whole lot, uh, so I ... I imagine it'll be fairly quick. Um, you know, a lot quicker than...than many other places we've been to, because they're kinda packrats and no ... nobody throws away anything.

Pierce:  That's not my house.

TFO Albers:  Okay. So ... so that's good. Um, and ... and ... and if she's gotta go to work, she can go to work or ... or whatever, so. Um, I ... I ... I can speak for many people that we work with that we try to accommodate as much as possible, um, uh, and empathize with ... with people and situations, so. Um, so, yeah, I don't ... I don't foresee it being ... being a lengthy process. Um, as ... as ... as far as your ... your phone, um, uh, you know, we will have to take a look at it, based on some information that ... that we've received. So, whether you wanna give us the passcode or ... or we obtain it, um, through a different way, it ... it's up to you, but, um, a little cooperation goes a long way. Um, you were worried about the Fourth Amendment, the ... and the search warrant does cover your ... your phone, so there is legal ... legal process with that, okay? Um, I noticed there's ... there's a four ... four-digit code.

Pierce:          It ... it ... I don't even remember what it is, I use face recognition on it, so I have no idea.

TFO Albers:    Okay.

Pierce:          That's partially why I don't even remember what it is.

TFO Albers:    Okay. All right, how... how long have you had that phone?

Pierce:          A year, not long.

TFO Albers:    Okay. Um, it would ... your old phones, what ... what do you do with those?

Pierce:          Uh, we sell them, they're all gone. I always wipe them out.

TFO Albers:    Is it ... is that like a trade-in, or ...

Pierce:          Yes.

[*FBI TFO Christopher Moore approaches the vehicle*]

TFO Albers:    He's gonna open the door.

Pierce:          Yeah.

TFO Albers:    Okay. All right.

After locating the iPhone XS Max on Pierce's person, agents provided the cell phone to FBI TFO Christopher Moore. (***See* Gov't Exhibit 11, Sworn Affidavit of FBI TFO Christopher Moore**). TFO Moore was sitting in his vehicle parked behind TFO Albers' SUV. TFO Moore could hear the interview of Pierce as the agents had an audio system set up that allowed them to hear one another. TFO Moore heard Pierce tell TFO Albers and SA Davis that he utilized the facial recognition feature on his cell phone. Based on TFO Moore's training and experience, he was aware that when an iPhone had the facial recognition feature enabled, after swiping up on the cell phone, the phone would attempt to recognize the user's face and if the user's face was unrecognized by the cell phone, it would then prompt the user to enter a

18

passcode. When TFO Moore attempted to swipe up on Pierce's cell phone, the facial recognition feature was not activated and instead the phone immediately prompted TFO Moore to enter a four-digit passcode. (**Gov't Exhibit 11).**

After receiving the passcode prompt, TFO Moore exited his vehicle and approached the passenger side of TFO Albers' SUV. TFO Moore opened the passenger door and stood approximately one to one and half feet from Pierce. TFO Moore was dressed in plain clothes, his weapon was covered, and he did not make any threatening motions or gestures while speaking with Pierce. (**Gov't Exhibit 11)**. The following exchange then occurred regarding Pierce's iPhone and biometrics. (**Gov't Exhibits 8, 14:44-16:51; and 9, Pgs. 11-13**).

| | |
|---|---|
| TFO Moore: | Hi there. I don't know if you noticed on the warrant, but it does include your biometrics. |
| Pierce: | Okay. |
| TFO Moore: | So, that which...basically what that means is we can use your facial recognition to get into the phone, okay? So that's what we're gonna go ahead and do. Okay. Now, on your phone ... |
| Pierce: | It doesn't...it doesn't always work to where it's... |
| TFO Moore: | Okay. Listen. Okay, I ... I do this for a living so I know that after a certain time goes by, you have to enter your passcode to enable facial recognition, okay? So, I ... I know you know your password, okay. I ... I really don't wanna make ... |
| Pierce: | Well, probably soon if I guessed, yeah. |
| TFO Moore: | Listen. I don't wanna make this any harder than it has to be, okay? We're the FBI. We're gonna get into your phone. Okay? All we have to do is drive this phone to our forensic lab and they're gonna unlock it for me in a couple hours. All right? Like he said — a little cooperation goes a long way. All right? I don't know everything you're into, all right? But we're ... I've done police work in one way, shape, or form for 16 years, okay? He's right — a little cooperation does go a long way. Okay? And, you know, like he said that, you know, this involves your house and your wife and your kids and stuff like that, so the more we can, you know, figure out what's going on, the easier it's gonna be on all them. |

Pierce:          So, a search warrant on a phone isn't a separate thing. It's on that search warrant?

SA Davis:        Yes, it's on the search.

TFO Albers:      Yeah, the search warrant is covering everything including...including your cars.

Pierce:          Yeah, I already saw the thing about the cars.

TFO Albers:      Yeah.

Pierce:          Okay.

TFO Moore:       All right. So, what...what is your passcode for this phone so we can speed this along a little bit?

Pierce:          I'll put my face on it. I .. .I usually use my face. I ...

Pierce:          ... about that.

TFO Moore:       Well, what I'm saying is ...

Pierce:          ... here, swipe up.

TFO Moore:       ... it's ... you've got it to where you have to put the passcode in to enable your face. Okay? So, I know you know the passcode to this phone.

Pierce:          Well, I ... It's either one of two things.

TFO Moore:       Go ahead and type it in.

Pierce:          There you go.

TFO Moore:       Okay. Thank you.

TFO Albers:      And what was that?

TFO Moore:       So, 1-1-1-6? [The last four digits of Pierce's cell phone number.]

TFO Albers:      Yeah.

Pierce:          Yeah. That was the last one I tried.

TFO Moore:       I appreciate it.

After this exchange, TFO Moore returned to his vehicle, input the passcode to Pierce's iPhone and reviewed most of the applications on the phone to include Grindr and Instagram. (**Gov't Exhibit 11**). Meanwhile, TFO Albers and SA Davis continued their interview of Pierce. In conducting their interview, TFO Albers and SA Davis utilized the information in the previously provided six-page document and ten images associated with the Pierce investigation to form most of their questions. (**Gov't Exhibit 5**).

### *Statements Made by Pierce During His Mirandized Interview*

In response to SA Davis and TFO Albers' questions, Pierce stating the following information. (**Gov't Exhibits 8 and 9**). Pierce had his current cell phone, the iPhone XS Max, since December 2018. Prior to the iPhone XS Max, Pierce had an older model iPhone for several years. Pierce confirmed the service provider for his cellphone was AT&T, and his internet service provider at home was Cox Communications.

Pierce opened an Instagram account about three or four years ago. When Pierce originally opened the account, he used his real name. During that time, he did not use Instagram regularly. About a year and a half ago, Pierce changed his Instagram account name to that of a female, which he was still using. Pierce confirmed the current name on the Instagram account was Addiestrode111. Pierce was shown the profile picture for the Instagram account of Addiestrode111, depicting a blonde female. Pierce confirmed the picture was of his Instagram account, and that he had been using the account name and profile picture since at least March 2020. Pierce made up the name Addie Strode, and the biographical information associated with the account was also fake.

Pierce was on Instagram one to two times per week chatting with males and females. Pierce's activity on Instagram increased in March 2020 due to the Coronavirus. Pierce used

Instagram to "troll" the internet, looking for local people with whom he could chat and possibly exchange sexual pictures and/or videos with. Pierce confirmed he did this for sexual gratification. Pierce posed as a male and female and communicated with both males and females. Pierce initially indicated he posed as an adult, but later stated he posed as a 16 or 17-year-old.

Pierce is attracted to people younger than him. Pierce only talks to individuals who are at least 18 years old, and he knows their age because he always asks how old they are when they begin communicating. (A statement he later contradicts while admitting he targeted children in the high school where he worked.) In the past, Pierce asked the people he chatted with whether they were gay or bisexual, and whether they were curious or interested in being with another male. After chatting with someone for an unspecified period, Pierce requested nude images or videos from the other individual. Regarding the types of sexually explicit images or videos he requested, Pierce indicated he asked for "anything they would send." The week prior to his interview, Pierce contacted someone on Instagram and requested sexual pictures from them. Pierce did not save the images and videos he received because he did not want his wife to find them.

Pierce was asked about one particular identified minor, whom he chatted with on Instagram. Pierce indicated he was very familiar with the 16-year-old minor and that he had personally known the minor since his freshman year. Further, that he met with this minor in the summer of 2020, though the meeting was not sexual in nature. Pierce was aware this minor was having struggles in his personal life. In the spring of 2020, Pierce saw a post the minor made on Instagram. Using the Addiestrode111 account, Pierce contacted the minor and pretended to be an underage female. Pierce requested and received two or three images of minors genitalia, and three videos of the minor masturbating.

Pierce indicated being online chatting with people and exchanging sexually explicit images or videos was a "thrill" for him and he was addicted to it. Pierce stated that he did not regularly receive sexually explicit images and videos from individuals under the age of 18 years old. Pierce estimated he had only received this type of content from 5 or less individuals who were not yet adults. Pierce denied masturbating to the images or videos he received. Pierce was shown a list of other Instagram usernames and denied recognizing them as individuals with whom he had communicated.

Pierce was shown several images he had shared with various minors on Instagram which he portrayed to be of his online persona, Addie Strode. These pictures were provided in the Instagram search warrant return information. Pierce confirmed he pulled the pictures from the internet. Pierce used a variety of social media including, Facebook, Twitter, Instagram and Snapchat. Pierce also used Kik several years ago.

Around 2:42:24 into the interview, TFO Moore approached the vehicle and asked Pierce questions about communications on the application Grindr. These questions mainly centered around Pierce's communications and interactions with an individual who referred to Pierce as "coach" within the Grindr chats. These were *the only questions asked* based on the information from Pierce's iPhone.

J.      **Search of Pierce's Vehicle and Seizure of Second iPhone**

During Pierce's interview, law enforcement searched Pierce's vehicle in accordance with the search warrant. Inside the vehicle, law enforcement located and seized a work laptop and second iPhone from a bag located on Pierce's passenger seat.[4] During Pierce's interview, SA

---

[4]      During his interview, Pierce told law enforcement he sold his old iPhone. (***See*** **Gov't Exhibits 8, 1:14:47-:15:05; 9, Pg. 55**).

Davis informed Pierce law enforcement located his old iPhone. (**Gov't Exhibits 8, 3:18:54-3:19:31; 9, Pg. 137**) SA Davis asked Pierce, "What's the...what's the passcode to that phone?" and Pierce confirmed it was the same passcode of 1116.

###### K.  Forensic Examinations of Pierce's iPhones

After Pierce's interview on September 2, 2020, TFO Moore transported Pierce's iPhones to forensic examiner, Detective Patrick Ladd, of the Topeka Police Department. (**Gov't Exhibit 11**). Detective Ladd has been employed by the Topeka Police Department in various roles for 22 years. (**Gov't Exhibit 12, Sworn Affidavit of Detective Ladd**). In 2009, Detective Ladd started performing cell phone examinations and has been doing so ever since. Detective Ladd has completed over one thousand (1,000) cell phone examinations. Since April 2018, Detective Ladd has utilized GreyKey, a state-of-the-art forensic access tool that extracts encrypted or inaccessible data from mobile devices. Detective Ladd has completed approximately 250 iPhone examinations using GreyKey.

In this case, Detective Ladd utilized GreyKey to extract the data from both of Pierce's iPhones. Because he was provided with Pierce's passcodes, he input the passcode after connecting the phones to the GreyKey device. After extracting the data, Detective Ladd used Cellebrite Physical Analyzer, a separate forensic tool, to parse through the information contained on the iPhones. This information was then turned over the TFO Broxterman.

Had Detective Ladd not been provided with the iPhone passcodes, he still would have accessed and obtained the data from Pierce's iPhones in one of three ways. First, even without the passcode to an iPhone, after connecting an iPhone to the GreyKey device, it has the ability to disable the Apple security on the phone. After disabling the security, GreyKey can extract 95% of the data on the iPhone. Second, to obtain all the data, Detective Ladd would have used

GreyKey to perform a brute force attack on the iPhones. A brute force attack, also known as an exhaustive search, occurs when the GreyKey device enters all possible passcodes into the iPhones. The longer or more difficult the passcodes are, the more combinations will need to be tested. In this case, however, because the iPhones had simple 4-digit passcodes, compared to 6-digit or a combination of numbers and letters type passcodes, there is only a limited number of passcodes possible. Detective Ladd has performed brute force attacks with GreyKey on iPhones with 4-digit passcodes and it has taken approximately 6 weeks to exhaust all possible passcodes and obtain all data from an iPhone. Detective Ladd is 100% confident that had he not been provided with the Pierce's iPhone passcodes; he would have been able to obtain all the data on the phones in this manner. Finally, Detective Ladd would have utilized any passcodes provided to him by law enforcement, including 1116 provided by an independent source, Pierce's wife.

**L.    Passcode Bank**

During investigations where digital devices are seized, if a forensic examiner is unable to access the contents of a digital device because they do not have the passcode and/or the software being used cannot bypass the passcode, law enforcement will provide the examiner with a passcode bank. (***See* Gov't Exhibit 3**). A passcode bank is a collection of possible passcodes associated with an individual suspect.

In this case, had Detective Ladd been unable to examine Pierce's iPhones, TFO Broxterman would have provided Detective Ladd with a list of possible passwords associated with Pierce—combinations of numbers personal to Pierce. (**Gov't Exhibit 3**). First, TFO Broxterman would have provided the passcode of 1116 that was given by Pierce's wife. Next, TFO Broxterman would have provided the following numbers associated with Pierce: address,

date of birth, social security number and phone number, both in a forward and backward format, as these numbers are commonly used by individuals as passcodes.

## ARGUMENT AND AUTHORITIES

**I. PIERCE VOLUNTARILY PROVIDED HIS IPHONE PASSCODES TO LAW ENFORCEMENT AFTER KNOWINGLY, VOLUNTARILY, AND INTELLIGENTLY WAIVING HIS *MIRANDA* RIGHTS ON A WRITTEN FORM**

In *Miranda v. Arizona*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona,* 384 U.S. 436, 444 (1966). To be effective, a waiver of rights must be made "voluntarily, knowingly, and intelligently." *Id*. *See also Smith v. Mullin*, 379 F.3d 919, 932 (10th Cir. 2004). To determine whether a suspect has made a voluntary, knowing, and intelligent waiver, a court must engage in two inquiries. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id*. If the court finds that under the totality of circumstances there was "both an uncoerced choice and the requisite level of comprehension," a defendant's waiver of *Miranda* rights will be considered voluntary, knowing, and intelligent. *Id*.

When analyzing the totality of circumstances, courts have considered factors such as "(1) the age, intelligence, and education of the defendant; (2) the length of [any] detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of [his or] her constitutional rights; and (5) whether the defendant was subjected to physical punishment."

*United States v. Carrizales-Toledo*, 454 F.3d 1142, 1153 (10th Cir. 2006). "The essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne." *Miller v. Fenton*, 474 U.S. 104, 116 (1985). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

When looking at the totality of circumstances surrounding Pierce's waiver of *Miranda* rights and subsequent statements, the recorded interview demonstrates by a preponderance of the evidence that the waiver was made knowingly, voluntarily, and intelligently. *See Lego v. Twomey*, 404 U.S. 477, 489, (1972) (The government has the burden of proving by at least a preponderance of evidence that a confession was voluntary.) Pierce's age, intelligence, and education do not suggest that he was unusually susceptible to coercion or compulsion. At the time of Pierce's interview, he was 40 years old and well educated, working as a high school teacher. His ability to utilize multiple online identities to solicit and manipulate countless minor boys (including children he worked with) into producing sexually explicit images of themselves, demonstrates his intelligence. Pierce further demonstrated his understanding of his situation when he inquired about the contents of the search warrant and asked what was taking place during the execution of the search warrant at his home. Pierce also made clear that he understood his rights when he stated to the agents that, prior to submitting to a polygraph, he would want to speak to a lawyer. (**Gov't Exhibits 8, 02:33:34; and 9, Pg. 103**).

Pierce was not detained while speaking with TFO Albers and SA Davis. Their initial conversation started outside of TFO Albers' vehicle and only moved inside the SUV once Pierce's neighbors started observing what was taking place, and Pierce agreed he wanted to talk

outside of their view. At no time was Pierce handcuffed or otherwise not free to leave while speaking with the agents.

Although *Miranda* warnings were not required under the circumstances in this case as Pierce was not in custody and free to leave during his interview, prior to asking Pierce any questions, TFO Albers did in fact read Pierce his *Miranda* rights.[5] After properly being advised of his *Miranda* rights and indicating he understood, Pierce signed an Advice of Rights form below the section entitled, "CONSENT" and the line stating, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." (**Gov't Exhibit 10).** After being advised of his *Miranda* rights, Pierce continued to speak with the agents for approximately 4 hours.

The nature of the questioning was not coercive. The agents were dressed in plain clothes, their weapons were not drawn, and Pierce was not handcuffed. All parties maintained a polite, respectful, and conversational tone with Pierce throughout the entire encounter. Even when Pierce admitted to being untruthful with the agents, they never changed their tone. (***See* Gov't Exhibits 8, 3:02:50; and 9, Pg. 125**). Pierce was calm and articulate when answering questions. Pierce was never threatened or physically mistreated in anyway. The agents acted respectfully and professionally throughout the entire interview and did nothing to overcome Pierce's will.

The evidence supports that Pierce's waiver of rights and subsequent statements, including his iPhone passcodes, were knowing, intelligent and voluntarily. But Pierce nevertheless attempts to rely on the Supreme Court's decision in *Bumper v. North Carolina* to argue that he only provided his iPhone passcodes to law enforcement after agents (allegedly) misrepresented

---

[5] Although Pierce's motion is devoid of any indication that *Miranda* warnings were provided, as evidenced in the audio and transcript of Pierce's interview, law enforcement immediately read Pierce his *Miranda* rights prior to asking any questions.

their authority under the search warrant, and therefore he did not consensually provide his passcodes. In *Bumper*, the defendant's grandmother allowed law enforcement officials to search her home after they asserted they had a warrant to search the house when in fact no warrant for the search of the house was ever returned. *Bumper v. North Carolina,* 391 U.S. 543, 546 (1968); *id.* at 546 n.15. The Supreme Court held the grandmother's alleged consent to be invalid, noting that "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search." *Id.* at 550.

The facts and issues in this case are wholly distinguishable from those in *Bumper*. First, this is not a case involving "consent." Law enforcement never asked Pierce for "consent" to search his iPhone. Rather law enforcement asked Pierce to open one of his iPhones, which he opened, and provide his passcode, which he provided—all during a voluntary interview. Law enforcement did not have to ask for "consent" to search Pierce's iPhones because a United States Magistrate Judge had already approved a lawfully issued search warrant upon probable cause, and that warrant included authorization to search and seize Pierce's iPhones and to utilize his biometrics, if necessary.

Second, even if the exchange between Pierce and law enforcement is viewed as asking for consent to search his phone, Pierce voluntarily provided it. Although Pierce alleges the FBI represented that the search warrant required him to provide the passcodes to his iPhones, that is factually inaccurate. Unlike *Bumper*—where law enforcement represented that it had a lawfully issued warrant when it later was determined none was proven to exist, *Bumper*, 391 U.S. at 546—at no time did law enforcement state tell Pierce that the search warrant for his iPhone required him to input the passcode. After agents asked Pierce for the passcode to his iPhone, Pierce said that no one had shown him the warrant. (**Gov't Exhibits 8, 08:54, and 9, Pg. 7**). In

response, the agents provided him with a copy of the warrant and time to review it. Pierce asked additional questions about the warrant and the agents explained to Pierce that the warrant was for all his electronic devices, including his iPhone, that it covered his car and included his biometrics. (**Gov't Exhibits 8, 16:03-16:15, and 9, Pg. 12**). When Pierce offered to put his face on his iPhone to initiate the facial recognition, TFO Moore explained to Pierce that based on the way he set his phone up, facial recognition did not work unless his passcode was entered. (**Gov't Exhibits 8, 16:20-16:25; and 9, Pgs. 12-13**). Pierce then entered his passcode and repeated it to the agent. (**Gov't Exhibits 8, 16:37-16:51; and 9, Pg. 13**).

Law enforcement never misrepresented they had a lawful search warrant, nor did they misrepresent the provisions contained within the warrant. Pierce's representation of how the interview occurred does not contain important details and his conclusions about what occurred are inaccurate. The full conversation between Pierce and law enforcement regarding his iPhone passcodes—as provided in the Statement of Facts section in this motion—clearly demonstrates that the agents never suggested the warrant *required* Pierce to input the passcode. (***See* Gov't Exhibits 8 and 9**). Even if framed as a question of consent under *Bumper*, Pierce consented to a search of his iPhones, and he voluntarily did so after the agents lawfully obtained a search warrant and truthfully and accurately described the contents of that search warrant to him. Pierce's decision to provide his iPhone passcodes to law enforcement was the product of a free and unconstrainted choice. The totality of the circumstances support that Pierce knowingly, voluntarily, and intelligently provided his passcodes to law enforcement after being *Mirandized* and waiving his rights.

II. **LAW ENFORCEMENT DID NOT VIOLATE THE WARRANT'S INSTRUCTIONS REGARDING UNLOCKING PIERCE'S IPHONES WHEN PIERCE PROVIDED HIS PASSCODES DURING A SUBSEQUENT VOLUNTARY INTERVIEW AS THE WARRANT'S INSTRUCTIONS DID NOT APPLY TO THAT INTERVIEW AND THE PRODUCTION OF HIS PASSCODES WERE NOT "COMPELLED"**

The first paragraph of the search warrant discussing biometrics stated, "[t]his warrant permits the FBI to *compel* the owners to unlock any devices requiring biometric access subject to seizure pursuant to this warrant." (**Gov't Exhibit 1, ¶ 12**) (emphasis added). After addressing the types of biometric features that may be compelled and how law enforcement can do so, the last sentence in this section stated, "[t]he proposed warrant does not authorize law enforcement to *compel* that the device owner state or otherwise provide the password or any other means that may be used to unlock or access the devices." (**Gov't Exhibit 1, ¶¶ 12a-h**) (emphasis added). This language did not preclude law enforcement from asking Pierce his iPhone passcodes during a voluntary and lawful interview. The intent and plain language of the "biometric" section of the warrant is to provide instructions to law enforcement about its collection and use of biometric data irrespective of any voluntary interview of a suspect. Those instructions were not meant to prevent lawful evidence gathering in the form of a post-*Miranda* interview of Pierce.

The term "compel" as used in the search warrant has a legal connotation and is contained in the Fifth Amendment itself. The Fifth Amendment provides that no person "shall be *compelled* in any criminal case to be a witness against himself." U.S. Const. amend. V. (emphasis added). A violation of the Fifth Amendment occurs when "the accused is (1) *compelled* (2) to make a testimonial communication and (3) such communication is incriminating." *Fisher v. United States*, 425 U.S. 391, 408 (1976) (emphasis added). This last sentence in the biometric section of the search warrant simply states that law enforcement cannot violate the Fifth Amendment in obtaining a suspect's passcode to a device. Ordinarily, to claim

the protections of the Fifth Amendment, an individual must actually invoke the right not to make statements, or his answers will not qualify as "'compelled' within the meaning of the Amendment." *Minnesota v. Murphy*, 465 U.S. 420, 427 (1984). Thus, to violate the Fifth Amendment and the language contained in the search warrant, there must have been some act of compulsion by law enforcement. In this case, there was none. *See* Argument and Authorities Part I, *supra*.

Pierce cites to several (mostly state court) decisions to support his argument that law enforcement violated the biometric provision in the search warrant. These cases are distinguishable in that none of the defendants in those cases input or provided their passcodes during a *Mirandized* voluntary interview. In contrast to this case, the defendants in these cases refused to provide their passcodes or decrypt their digital devices, and each court found the steps taken by the government after such refusals would have forced or compelled them to do so in violation of the Fifth Amendment. As noted below, none of the actions taken by the government in these cases occurred here. Instead, these cases support the government's position that Pierce was not "compelled" to input or provide his iPhone passcodes.

The case *In re Grand Jury Subpoena Duces Tecum*, addressed an appeal from a judgement of civil contempt. 670 F.3d 1335, 1337 (11th Cir. 2012). Pursuant to a lawful search warrant in a child pornography case, law enforcement seized multiple digital devices from the defendant. *Id*. at 1339. Forensic examiners analyzed the digital media but could not access certain portions of his encrypted hard drives. *Id*. The defendant was served with a subpoena requiring him to appear before a grand jury to produce the unencrypted contents located on his computer and external drives. *Id*. The defendant refused to decrypt the devices and a show cause hearing ensued. *Id*. The district court held the defendant in contempt and committed him to the

custody of the United States Marshal. *Id*. at 1340. The Eleventh Circuit held that compelling the defendant in this way to decrypt his hard drives would violate the Fifth Amendment. *Id*. at 1341.

In *Eunjoo Seo v. State*, after the defendant refused to provide her cell phone passcode to the police, law enforcement obtained a search warrant that "'compelled' the defendant to unlock her cell phone and stated that she would be subject 'to the contempt powers of the court' if she failed to do so." 148 N.E.3d 952, 954 (Ind. 2020). The defendant again refused to unlock her iPhone and the State moved to hold her in contempt. *Id*. The trial court agreed with the State and held her in contempt. *Id*. The Indiana Supreme court reversed the trial court's order holding the defendant in contempt finding that compelling the defendant to unlock her cell phone in this manner violated the Fifth Amendment. *Id*. at 962.

In *Commonwealth v. Davis*, law enforcement executed a residential search warrant and seized the defendant's computer. 220 A.3d 534, 538 (Pa. 2019). After being *Mirandized*, law enforcement asked the defendant to provide the password to his computer. *Id*. The defendant did not provide his password. *Id*. The Commonwealth then filed a pre-trial motion to compel the defendant to divulge the password to his computer. *Id*. at 539. The defendant opposed the motion to compel. *Id*. The Supreme Court of Pennsylvania held that compelling the defendant to provide the passcode to his computer would violate the Fifth Amendment. *Id*. at 551. Noticeably absent from this case is any mention from the court that simply asking the defendant for his passcode after being *Mirandized* somehow equaled compulsion in violation of the Fifth Amendment.

In *United States v. Kirschner*, the defendant's computer was seized during a child pornography investigation. *United States v. Kirschner*, 823 F. Supp. 2d 665, 667 (E.D. Mich. 2010). The defendant was issued a grand jury subpoena asking that he testify to the password on his computer. *Id*. at 668. The defendant moved to quash the subpoena arguing that requiring him

to testify before the grand jury pursuant to the subpoena would violate his Fifth Amendment right. *Id*. The court agreed and quashed the subpoena stating that requiring the defendant to provide his password to the grand jury would violate the Fifth Amendment. *Id*. at 669.

All these cases are inapposite to the facts in this case. These cases simply illustrate examples of the government attempted to *compel* an individual to provide his cell phone passcode when the individual has otherwise refused to provide it. These cases do not stand for the proposition that when law enforcement has a search warrant for a phone and asks a suspect to input or provide the passcode during a knowing, voluntary, and intelligent interview, such a request equates to compulsion in violation of the Fifth Amendment.

"[T]he touchstone of the Fifth Amendment is compulsion." *See Lefkowitz v. Cunningham*, 431 U.S. 801, 807 (1977). Just because Pierce stated, "don't think I'll give that out unless I'm forced to on something obviously" when first asked about his iPhone passcode, does not mean that he was automatically "compelled" when he later input and provided his passcode to law enforcement. In looking at the totality of the circumstances, and listening to the recorded interview of Pierce, it is clear he was not compelled in any manner to provide his iPhone passcodes to law enforcement. Because there was no act of compulsion, law enforcement did not violate the search warrant's instructions regarding unlocking digital devices nor did they violate the Fifth Amendment. By asking Pierce for his passcode after providing him with *Miranda* warnings, law enforcement engaged in lawful evidence gathering and as such the contents of Pierce's iPhones should not be suppressed.

### III. EVEN IF THE GOVERNMENT TECHNICALLY VIOLATED THE WARRANT'S INSTRUCTIONS THE EXCLUSIONARY RULE SHOULD NOT APPLY

Even if this court were to conclude that law enforcement technically violated the warrant's instructions or Pierce's Fifth Amendment rights, the exclusionary rule should not apply for the following reasons. First, law enforcement had an independent source who provided Pierce's iPhone passcodes. Second, it was an inevitable discovery that law enforcement would have opened and accessed Pierce's iPhones because (1) the four-digit passcode was so simple that law enforcement's forensic software would have opened/decrypted them; and (2) law enforcement's use of a passcode bank—a collection of possible passcodes associated with an individual suspect's life—would have yielded the four-digit passcode because that code was the last four digits of Pierce's own cell phone number. Third, law enforcement's actions were in good faith as the plain language of the warrant's instructions did not preclude a voluntary interview of the defendant nor asking him about his passcode during that interview. Fourth, Pierce's statements and the contents of his iPhones were not tainted by any fruit of the poisonous tree. The questions asked of Pierce during his interview were mainly based on previously provided information regarding Pierce's child exploitation activity, and not based on the contents of his iPhone. Because the defendant's statements as to his iPhone passcodes were given voluntarily, the contents of the defendant's iPhones are admissible as the physical fruit of those voluntary statements in accordance with the Supreme Court's precedent in *United States v. Patane*.

#### A. Pierce's iPhone Passcodes Were Discovered Based on an Independent Source, i.e. Pierce's Wife

Under the independent source exception to the exclusionary rule, "evidence that has been discovered by means wholly independent of any constitutional violation" is admissible against a

criminal defendant. *Nix v. Williams*, 467 U.S. 431, 443 (1984). A source is genuinely independent if the government can show that the evidence was obtained by "means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). As the Supreme Court has explained, where an "independent source" leads agents to challenged evidence, that evidence is not subject to suppression because it "would put the police in a worse position than they would have been ... absent any error or violation." *Nix*, 467 U.S. at 443; *see also United States v. Eylicio–Montoya*, 70 F.3d 1158, 1164–65 (10th Cir. 1995).

The contents of Pierce's iPhones would have been discovered at the same exact time and in the exact same way based on an independent source, i.e. Pierce's wife. On the morning of September 2, 2020, law enforcement simultaneously interviewed Pierce (after stopping his vehicle) and his wife (during the execution of the residential search warrant). During her interview, Pierce's wife provided law enforcement with Pierce's cell phone number and his iPhone passcode of "1116" which she identified as "just the end of his phone number." (**Gov't Exhibit 7, 14:01 and 14:10**). Had Pierce not provided his passcode, TFO Moore would have called the agents executing the residential search warrant once he got back in his vehicle to if Pierce's wife provided the passcode. (**Gov't Exhibit 11**). Because she did, the passcode would have been obtained at the same time and in the same manner by an independent source. As such, law enforcement obtained Pierce's passcode independent of any unlawful government conduct and therefore Pierce's statements and the contents of his iPhones are admissible based on the independent source exception to the exclusionary rule.

### B. Pierce's iPhone Passcodes Would have Inevitably Been Discovered by Lawful Means

Under the inevitable discovery doctrine, improperly seized evidence may nevertheless be admitted "[i]f the prosecution can establish by a preponderance of the evidence that the

information ultimately or inevitably would have been discovered by lawful means." *Nix, at* 444; *see also United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014). If the government can demonstrate inevitable discovery, the evidence is not fruit of the poisonous tree and need not be suppressed. *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006); *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001).

      1.    *Pierce's iPhone Passcodes and the Contents of the iPhones Would Have Been Discovered Through a Forensic Examination.*

The facts show Pierce's iPhone passcodes would have inevitably been discovered through a forensic examination. As noted in Detective Ladd's affidavit, even without Pierce inputting or providing his passcodes to law enforcement, he would have been able to successfully obtain the passcode and contents of Pierce's iPhones in one of three ways. (**Gov't Exhibit 12**). First, Detective Ladd connected the iPhones to GreyKey, a forensic software tool capable of removing Apple's encryption security feature, bypassing the need for a passcode. This method would have provided approximately 95% of the contents on the device, including pictures and messages.

Second, GreyKey is also able to execute a "brute force attack" on iPhones like Pierce's.[6] Because Pierce chose to use a 4-digit passcode on his iPhones, Detective Ladd is 100% confident he would have been able to determine the passcode and thereby obtain the full contents of the phone, as there is a limited number of combinations the passcode could be. Detective Ladd has successfully performed a brute force attack on a 4-digit iPhone many times before. Thus, a forensic examination would have inevitably discovered the passcode and content on Pierce's iPhones even if he did not input or provide the passcodes to law enforcement. *See United States*

---

[6] A brute force attack, also known as an exhaustive search, occurs when the GreyKey forensic device enters all possible passcodes into an iPhone. Once the correct passcode is entered, the contents of the iPhone can be extracted.

*v. Todd*, 2017 WL 1197849, *13 (S.D. Ga. 2017) ("as [the agent] testified, [the] FBI offices ... had the technological capabilities to bypass the swipe pattern and access the contents of [d]efendant's cell phone[;] [t]hus, regardless of whether officers violated [d]efendant's *Miranda* rights in obtaining [d]efendant's swipe pattern, the inevitable discovery doctrine prevents suppression of the evidence attained from the cell phone search"), report and recommendation adopted by, 2017 WL 1172113 (S.D. Ga. 2017); *United States v. Will*, 2015 WL 3822599, *16 (N.D. W. Va. 2015) (applying inevitable discovery doctrine to deny motion to suppress alleging violation of *Miranda* rights in officers obtaining cell phone password from defendant, finding officers possessed technology to access phone contents without password); and *United States v. Jackson*, 2020 WL 810747, at *12 (W.D.N.Y. 2020), report and recommendation adopted, by 2020 WL 1557416 (W.D.N.Y. 2020) (finding that contents on SD located inside defendant's cell phone would have been discovered even if defendant had not been compelled to provide the passcode to the phone or present his biometric features to unlock the phone).

Lastly, Detective Ladd would have input any passcodes provided by TFO Broxterman. As discussed below, this would have included the passcode of "1116."

2.    *Pierce's iPhone Passcode and the Contents of the iPhones Would Have Been Discovered Because Pierce's Wife Provided the Passcode to Law Enforcement During Her Interview.*

As noted above, law enforcement simultaneously interviewed Pierce and his wife. During her interview, Pierce's wife provided law enforcement with Pierce's iPhone passcode. TFO Moore and TFO Broxterman both explained in their affidavits that it is standard practice for law enforcement to ask all parties involved in an investigation, including family members, for passcodes to digital devices. (**Gov't Exhibits 3 and 11**). As noted above in under the independent source section, had Pierce not input or provided his iPhone passcode, once TFO

Moore returned to his vehicle, he would have called the agents who were executing the residential search warrant to see if Pierce's wife provided the passcode during her interview. (**Gov't Exhibit 11**). Here, because Pierce's wife did in fact provide Pierce's correct passcode, TFO Moore would have inevitably gained access to the contents of Pierce's iPhone, and just as he did in this case, he would have provided the passcode to Detective Ladd.

3. *Pierce's iPhone Passcode and the Contents of the iPhones Would Have Been Discovered When TFO Broxterman Provided the Forensic Examiner with a Passcode Bank Consisting of Pierce's Passcode.*

In the event Pierce did not provide his passcode and Detective Ladd was unable to bypass it with GreyKey, the contents of Pierce's iPhones still would have been obtained after TFO Broxterman provided Detective Ladd with a collection of possible passcodes associated Pierce. As noted in TFO Broxterman's affidavit, creating a passcode bank is a common practice when law enforcement is unable to access the contents of digital devices. (**Gov't Exhibit 3**). The possible passcodes TFO Broxterman would have included in a passcode bank are as follows: "1116" as that was the code provided by Pierce's wife during her interview, and Pierce's address, date of birth, social security number, and phone number, both in a forward and backwards format. Because Pierce's passcode to both iPhones was "1116" which is the last four digits of his cell phone number and the same code provided by his wife, TFO Broxterman would have provided the correct passcode to Detective Ladd, who in turn, would have entered the passcodes into Pierce's iPhones, inevitably obtaining the contents of the iPhones.

The evidence supports that even had Pierce not input or provided his iPhone passcodes to law enforcement, the agents would have inevitably discovered the passcodes and therefore the contents of his iPhones. Accordingly, Pierce's statements and the contents of his iPhones are admissible under the inevitable discovery doctrine.

**C.     Law Enforcement's Actions Were in Good Faith as the Plain Language of the Warrant's Instructions Did Not Preclude Asking Pierce for his iPhone Passcode During a Voluntary *Mirandized* Interview**

In *United States v. Leon*, the Supreme Court established a good faith exception to the exclusionary rule under which "evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was objectively reasonable." *United States v. Leon*, 468 U.S. 897, 918-19 (1984).  There are four circumstances in which the *Leon* good faith exception will not apply: (1) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) if "the issuing magistrate wholly abandoned his judicial role as a neutral and detached decision maker and served merely as a rubber stamp for the police; (3) if the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) if under the circumstances of the case the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id*. at 923.

Here, law enforcement obtained a lawful valid search warrant authorizing the seizure and search of Pierce's iPhones. The agents were familiar with the contents of the search warrant as they explained the warrant to Pierce during his interview. Law enforcement reasonably relied on the search warrant when asking Pierce to input and provide his iPhone passcodes as the plain language of the warrant's instructions did not preclude law enforcement from conducting a voluntary interview of Pierce nor did it state law enforcement could not ask for the passcode during that interview. Because none of the four exceptions in which the *Leon* good faith exception does not apply are applicable here—and because the interviewing agents had

reasonable grounds to believe they could ask Pierce to input and provide his iPhone passcodes during a *Mirandized* voluntary interview—their actions were done in good faith. Thus, Pierce's statements and contents of his iPhones are admissible based on the good faith exception to the exclusionary rule.

D.    **Pierce's Statements and the Contents of his iPhones Were Not Tainted by the Fruit of the Poisonous Tree**

      1.    *The Questions Posed to Pierce During his Interview Were Mainly Based on Previously Obtained Information by the FBI and Not Based on the Contents of His iPhone.*

Pierce argues that his statements should be suppressed as they were made only after law enforcement unlawfully reviewed his iPhone and questioned him regarding the contents. This, however, is factually incorrect. Pierce's statements were made after being questioned by TFO Albers and SA Davis about information they had been previously provided regarding the investigation into Pierce. (***See* Gov't Exhibits 4, 5, and 6**). Prior to Pierce's interview, the FBI had engaged in a thorough investigation into Pierce's child exploitation activity. This included serving search warrants on the Addie8651/Addiestrode111 Instagram account believed to be used by Pierce, receiving a response from Instagram containing images and messages between users, issuing subpoenas on Pierce's internet and cell phone providers, conducting interviews of victims and their parents, and conducting surveillance on Pierce's residence. (***See* Gov't Exhibits 2 and 3**).

Prior to the pre-search briefings conducted on September 1, 2020 and the morning of September 2, 2020, TFO Broxterman provided TFO Albers and SA Davis with a six-page document consisting of the background information obtained by the FBI up to that point. (***See* Gov't Exhibits 3, 4 and 5**). The agents used this information in formulating their questions to Pierce. The questions during Pierce's interview correlate with the information contained in this

document. The agents were also provided with ten images that were used by the Addie8561/Addiestrode111 Instagram account. (**Gov't Exhibit 6**). The agents specifically asked Pierce about each image during his interview. (**Gov't Exhibits 8, 2:37:26- 2:41:52; and 9, Pgs. 105-108**). A very limited number of questions were asked based on the contents of Pierce's iPhone and they mainly centered around one conversation on the application Grindr where the victim referred to Pierce as "coach." (***See* Gov't Exhibits 8, 2:42:24-2:52:05; and 9, Pgs.108- 119**). Prior to TFO Moore's questions, however, Pierce had already voluntarily mentioned that he used the application Grindr to "hook up" with a guy. (**Gov't Exhibits 8, 2:25:07; and 9, Pg. 98**). Because the agents mainly questioned Pierce about the information already in their possession and which did not relate to the contents of his iPhone, Pierces statements were not the fruit of any violation and thus should not be excluded.

2.      *The contents of Pierce's iPhones are admissible as the Physical Fruit of Voluntary Statements in Accordance with United States v. Patane and United States v. Oloyede.*

In *United States v. Patane*, law enforcement failed to provide *Miranda* warnings to a suspect before asking him the location of his firearm, which he then disclosed. 542 U.S. 630, 635 (2004). The plurality opinion deemed the firearm admissible, reasoning that "the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause" and that the Clause "is not implicated by the admission into evidence of the physical fruit of a *voluntary statement*." *Id*. at 636 (emphasis added). The Court further stated, "[t]he admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial." *Id*. at 643.

The court in *United States v. Oloyede*, applied the *Patane* decision in the context of cell phone passcodes. 933 F.3d 308 (4th Cir. 2019). During the execution of a search warrant at the

defendant's house, an FBI agent handed the defendant a locked cell phone that had been found in her bedroom and asked her, "Could you please unlock your iPhone?" *Id*. The Defendant entered the passcode and handed the cell phone back to the agent who then gave it to a forensic examiner to be searched. *Id*. The agent did not ask for or see the passcode. *Id*. At trial, the Defendant moved to suppress the contents of the cell phone, arguing that her Fifth Amendment right against self-incrimination was violated when the agent asked her to unlock the phone without giving her *Miranda* warnings. *Id*. The trial court denied the motion. *Id*. On appeal, the defendant argued that her act of unlocking the phone was testimonial and in the absence of *Miranda* warnings, the cell phone must be suppressed. *Id*. at 309. The Fourth Circuit disagreed stating, "even were we to accept [defendant's] argument that she made a testimonial communication when she unlocked her phone, it would provide no meaningful help to her defense because the fruit of that voluntary communication, even though made without a *Miranda* warning, would nonetheless be admissible into evidence." *Id*. The court stated, "the admission into evidence of data from [defendant's] phone — the fruit of her opening it — 'present[ed] no risk that ... *coerced statements* (however defined) [would] be used against [her] at a criminal trial.'" *Id*. at 310 (quoting *Patane*, 542 U.S. at 643) (emphasis added).

The admission into evidence of the contents of Pierce's iPhones do not present a risk that coerced statements would be used against him at trial because he voluntarily input and communicated his iPhone passcodes to law enforcement. In accordance with *Patane* and *Oloyede*, the contents of Pierce's iPhones are admissible as the physical fruit of voluntary communications made by him during his consensual interview with law enforcement.

**CONCLUSION**

For the reasons stated herein, Pierce's motion to suppress statements and evidence should be denied. Given the existence of an unambiguous transcript and recording of the defendant's *Mirandized* interview, there is no disagreement regarding material facts. *See United States v. Glass*, 128 F.3d 1398, 1409 (10th Cir.1997) ("[t]he defendant bears the burden of showing there are material facts in dispute, and an evidentiary hearing is only required when the motion to suppress raise[s] factual allegations that are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in issue.") Accordingly, the United States asserts that a hearing is not required. If, however, a hearing is held, the United States requests that the hearing be held by video conference.

Respectfully submitted,


STEVE GROCKI
Department of Justice, Criminal Division
Chief, Child Exploitation and Obscenity Section


/s/ Kaylynn N. Foulon
Kaylynn N. Foulon, FL#0085397
Trial Attorney
Department of Justice, Criminal Division
Child Exploitation and Obscenity Section
Telephone: (202) 674-5661
Email: kaylynn.foulon@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2021, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

/s/ Kaylynn N. Foulon
Kaylynn N. Foulon, FL#0085397
Trial Attorney
Department of Justice, Criminal Division
Child Exploitation and Obscenity Section
Telephone: (202) 674-5661
Email: kaylynn.foulon@usdoj.gov