IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                     *Plaintiff,*<br>v.<br><br>JEFFREY DAVID PIERCE,<br><br>                     *Defendant.* | Case No. 20-40068 |

## REPLY IN SUPPORT OF MOTION TO SUPPRESS

"'In a government of laws . . . existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.'"

*Elkins v. United States*, 364 U.S. 206, 223, 80 S. Ct. 1437, 1447 (1960) (quoting with favor *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564 (Brandeis, J., dissenting)). The exclusionary rule exists to ensure the government does not become the lawbreaker. By removing the incentive for law enforcement to disregard the protections the Constitution affords to all, it acts to curb deliberate police misconduct. *See id.* at 217-218. And deliberate police misconduct is precisely what occurred in this case.

The plain language of the warrant specified that smart phone searches could occur only "in accordance with the procedures set forth in the affidavit submitted in

support of this warrant." Exhibit 102, Attachment B, p. 1 & p. 5 ¶ 19. Those "procedures set forth in the affidavit" *specifically prohibited* law enforcement officers from "compel[ling] that the device owner state or otherwise provide the password or any other means that may be used to unlock or access the devices." Exhibit 101 at 22.

Yet, when Pierce cited his Fourth Amendment rights in declining to provide his phone passcode "unless forced," TFO Albers told him a search warrant—a court order designed for the specific purpose of allowing law enforcement officers to look inside property—"covered it." Ex. 103 at 10. Then, invoking the authority of the same search warrant, TFO Moore commanded Pierce to enter and state his passcode. Ex. 103 at 11-13. And Moore did so while citing the portion of the warrant affidavit permitting officers to use biometrics—*the very same portion of the affidavit specifically prohibiting law enforcement officers from compelling Pierce's passcode*:

> h. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of the device owner to the fingerprint scanner of the devices found at the PREMISES; (2) hold the devices found at PREMISES in front of the face of the owners face and activate the facial recognition feature; and/or (3) hold the devices found at the PREMISES in front of the face of the owner and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. **The proposed warrant does not authorize law enforcement to compel that the device owner state or otherwise provide the password or any other means that may be used to unlock or access the devices.**

Exhibit 101 at 22 (emphasis added); *compare* Ex. 103 at 11-13.

The government runs through the series of cases in which courts have held that a defendant's passcode was unlawfully compelled, stating that Pierce's passcode was not compelled "in that way" or "in this way" and so it was not compelled at all. Response at 32-34. But the "way" each court deemed unlawful compulsion was precisely what occurred here: putting the weight of a court order behind a demand for a passcode. *See id.*

This was not accidental. It was not excusable. And Mr. Pierce's response was not—as the government construes (or, rather, misconstrues) the issue before the Court—a knowing, voluntary, and intelligent waiver of his Fifth Amendment right to remain silent. It was, like the situation in *Bumper v. North Carolina*, acquiescence to the law enforcement officers' claims of lawful authority. 391 U.S. 543, 549, 88 S.Ct. 1788 (1968). By claiming authority under the Fourth Amendment pursuant to the search warrant, the officers announced in effect that Pierce had no right to resist their demands for his passcode. *See id.* at 550. Their false representation that a search warrant justified their demands was no less than "colorably lawful coercion," *i.e.*, compelling the device owner to state or otherwise provide the password to unlock his devices under the guise that a court order required it. *Id.*

Law enforcement officers charged with the responsibility to uphold and enforce the law violated one of the most fundamental guarantees of the United States Constitution, and they did it deliberately. Settled Supreme Court precedent instructs that we cannot allow the ends to justify such means. *Elkins*, 364 U.S. at 223. The evidence obtained as a result of the officers' misconduct must be

3

suppressed in order to remove the incentive for these officers or their colleagues to continue this pattern in the future.

None of the government's asserted exceptions should prevent this result.

## I. The *Leon* good faith exception does not apply.

Let us dispense with the easiest claim first. The good faith exception announced in *United States v. Leon*, applies when evidence is obtained by officers acting in reasonable reliance on a search warrant <u>later found to be unsupported by probable cause</u>. 468 U.S. 897, 104 S.Ct. 3405 (1984). Because Pierce has not challenged the validity of the warrant obtained or whether there was probable cause to support it, the *Leon* good faith exception has no application here.

## II. None of the government's arguments save Mr. Pierce's statements from suppression.

Because the good faith exception does not apply, nothing saves Mr. Pierce's statements from suppression. Even assuming, *arguendo*, law enforcement would have eventually gained access to the contents of Pierce's phones through Keelin, GrayKey, or otherwise, the government cannot prove that law enforcement's eventual viewing of that data would have resulted in the precise statements Pierce made in response to the officers' exploitation of their simultaneous search of his phone. Law enforcement had no independent source through which to obtain Pierce's statements, and they were not inevitable.

The government asserts agents would have asked substantially the same questions of Pierce whether or not he complied with their demands to unlock his

phone. That may be true, but it is irrelevant. The issue is not whether immediate access to Pierce's phone gave agents the insights necessary to formulate their questions. The issue is whether agents exploited their immediate access to his phone to influence Pierce's decision to *respond* to their questions. And they absolutely did.

*Every* substantive question was posed *after* Pierce unlocked his phone and provided the passcode he used for both phones. And *every* substantive question was posed *after* Albers and Davis cited Moore's access to the information stored on Pierce's unlocked phone as a reason for Pierce to talk.

Throughout the interview, Albers and Davis stated or implied that Moore was actively reviewing the contents of Pierce's phone and that law enforcement would later perform additional "forensic" analysis (now that their knowledge of the passcode allowed them access to the contents of Pierce's phones at any time):

- Albers: ...on those sites? Okay. Um, so, if we, um, since he's [TFO Chris Moore] on...on your phone right now, um...
  Davis: He's, well, so there's a photo vault so we need the passcode to the photo vault.
  Exhibit 103 at 21.

- Davis: He [TFO Chris Moore] says that the passcode's not working.
  Pierce: It is, it's 1234.
  Davis: Well, he's tried it and it's not working, so is there another passcode that you can think of?
  Exhibit 103 at 22.

- Davis: You've got a...so Chris [Moore] actually has a image from your phone that he sent, so this is the account addiestrode111.
  Pierce: Oh, yeah.
  Davis: Is that the Instagram account that you're currently using?

5

> Pierce: Yeah.
> Exhibit 103 at 38.

- Albers: . . . the forensics aren't going to lie, right? We have capability, especially with the...the iPhones pulling up messages have been deleted, pictures that have been deleted. Um, we have the capability of obtaining those things other ways as well.
  Exhibit 103 at 55.

- Davis: Maybe we could discuss what got us here and then Chris [Moore] has a couple of things.
  Exhibit 103 at 56.

- Davis: Okay, because there's three videos of [redacted name] on your...on your phone and [redacted name] masturbating in the videos.
  Pierce: How long ago were those?
  Davis: They're full body videos. I don't know how long ago.
  Exhibit 103 at 89.

- Davis: It looks like you were chatting on Instagram this morning.
  Pierce: With who?
  Davis: I don't know. It appears there was at least some communication [Inaudible 02:18:22] your phone, so.
  Exhibit 103 at 94.

Moore also directly confronted Pierce with information he found on his phone. *See, e.g.,* Exhibit 103 at 108-119, 122, 125-129.

The obvious, undeniable, and often express purpose of these statements was to get Pierce to talk about—or, as the officers put it, "explain" the contents of his phone:

- Albers: Yeah, like I say, cooperation is...is key in this, okay? Uh, the... I understand that you may...you may be concerned about something on your phone and...and we can talk about that. Um, but the...the only way that we're able to...to get past that is to actually have a conversation about it, okay? Um, that way you're able to explain something that...that we may...that may be visible and kinda put it in context.
  Exhibit 103 at 13.

6

- Albers: Um, huh, obviously, he's...he's starting to...to look at your phone, um, what...what is on the phone that...that you think we would, uh, be interested in as...as it relates to, uh, child exploitation matters?
  Exhibit 103 at 14.

- Albers: Which I get, I get that. Um, but again, the...the forensics are gonna paint a more accurate picture than...than what you're willing to...to tell us. Now, you do have the capability right now to explain, uh, you know, how, you know, kinda the why. We know...we know when, we know who, we know where, um, you know, we know these things. But we don't...the only way we're able to...to understand where you're coming from is by you explaining it.
  Exhibit 103 at 56.

- Albers: . . . I get the feeling that you wanna talk about it, you wanna explain it, but for whatever reason, you're...you're hesitant. That's not going to be helpful at all. Um, like I said, the...the forensics are going to paint an accurate picture, um, of when it started and what was said, but we can't get into your mind and figure out, you know, what. Or are we just supposed to assume the very worst?
  Exhibit 103 at 57.

- After confronting Pierce with a Grindr chat he found when reviewing the phone Pierce unlocked, Moore said: "So, okay, then explain this to me."
  Exhibit 103 at 109.

- Moore also found an Instagram chat when reviewing Pierce's unlocked phone. Noting that it appeared Pierce was conversing with a 15-year-old, Moore pressed him for more information: "How many people under the age of 16 do you think you've chatted with and talked explicitly and asked for explicit images and videos from?"
  Exhibit 103 at 123.

Officers exploited the fact that they had unlawfully compelled Pierce's passcode and, thereby, gained access to the contents of his phone—citing that access to pressure him to answer their questions. His responses, which derived immediately from officer's unlawful entry into Pierce's phone are, indeed, the "fruit"

7

of official illegality. *See Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407 (1963).

### III. Keelin's provision of the passcode was not wholly independent of any constitutional violation and was not inevitable.

The government claims that the independent source doctrine saves Pierce's statements and the contents of his phones from suppression because his wife, Keelin, also told officers the passcodes to his phones. But the independent source doctrine does not simply allow admission of evidence that has been discovered through *another source*. The independent source doctrine allows admission of evidence that has been discovered "by means wholly independent of any constitutional violation." *Nix v. Williams*, 467 U.S. 431, 443, 104 S. Ct. 2501 (1984). Because Keelin provided the passcode pursuant to the same colorably lawful coercion by which it was extracted from Jeff, the officers did not obtain it "by means wholly independent of any constitutional violation."

Special Agents Trisha McCormick and Jarrod Forgues-Schlenker were assigned to interview Keelin Pierce. Before they were introduced, other agents had entered her home early in the morning; told her Jeff was in police custody; taken her phone from her bedroom; and required her to wait to call her boss to say she would be unable to come in to work that morning.

Forgues-Schlenker began the conversation by telling Keelin that someone at the IP address associated with her home was chatting with and exchanging naked images of kids. As Forgues-Schlenker held onto Keelin's phone, McCormick

8

provided Keelin a copy of the search warrant. Notably, however, neither the warrant nor the attachments addressed the fact that law enforcement were prohibited from compelling the means for unlocking electronic devices. *See* Exhibit 102. This restriction was not explained to Keelin either.

To the contrary, McCormick, in purported explanation of the warrant, merely reviewed the caption:

> United States District Court--for your address. Um, looks like we've got some vehicles on there--your van, um, your husband's SUV, and your truck. Um, and then there's a part for your husband's person as well.

Forgues-Schlenker added that the warrant was "for digital media" and said officers would "need to" "look through" all phones, computers, and flash drives in the house and "potentially take some of that." That, he reiterated, was why he was "hanging onto [her] phone."

McCormick told Keelin she was not under arrest and "free to leave" her own home if she wanted to, but simultaneously emphasized that officers would remain in her home pursuant to the search warrant by which they gained entry and began exercising authority over it. While McCormick told Keelin she could end the interview at any time, that announcement was not tied to information Keelin would be asked to provide. Rather, McCormick presented it as an opportunity for Keelin to walk away from McCormick and Forgues-Schlenker "explaining everything" and "sharing information" with her.[1]

---

[1] McCormick's language at this early point in the discussion is drastically different from language she uses one hour into the recording—after telling Keelin that Jeff has

Forgues-Schlenker then told Keelin they needed to relocate to accommodate the agents who would be searching her home. Keelin obliged. Then, after getting settled, questioned the basis for the warrant: "So, is there a way it can come back to our IP—whatever—address and it not be on any of our devices? I don't understand." But Keelin was not in control of this conversation. The officers were. McCormick told Keelin they would address that later.

When Forgues-Schlenker was ready to let Keelin call her boss, he instructed her to unlock her phone (in view of both officers), and stated that he would be watching what she did. Keelin explained who she was calling and why, and placed two calls on speaker phone so the officers could hear her conversations.

After the calls, as Forgues-Schlenker and McCormick prepared to finally begin questioning Keelin, Forgues-Schlenker returned to Keelin's question about the basis for the warrant. He explained that it is not possible that the communications of interest to law enforcement originated from someone outside her home. His message? The warrant was justified; it was legitimate.

Immediately following Forgues-Schlenker's validation of the warrant—that court order authorizing law enforcement's uninvited intrusion into her home, the one authorizing them to "look through" all the digital media in her home, the reason why he took her phone and would not let her touch it without his supervision—Keelin was asked to provide three things: her phone number, her husband's phone number, and

---

been arrested and will be charged that day. Specifically, at 01:00:14, when referring to her next set of questions, McCormick tells Keelin: "You don't have to answer these."

the passcode to her husband's phone. (There was no need to ask for Keelin's passcode, as the officers had just insisted on watching her type it in before permitting her to call her office.)

Under these circumstances, Keelin's responses were "no more than acquiescence to a lawful claim of authority." *Bumper v. North Carolina*, 391 U.S. 543, 549, 88 S.Ct. 1788 (1968). The law enforcement officers questioning Keelin had just told her that a warrant authorized them to examine all the phones they could find in her and her husband's home and cars. Under authority of that warrant, law enforcement officers had prohibited Keelin from using her own phone without police supervision and required Keelin to enter her own passcode as officers supervised. Having claimed authority to access and review all the family's electronic devices and having just exercised that authority over Keelin's phone, McCormick and Forgues-Schlenker presented a situation in which Keelin would have believed she had no right to resist a request for the passcode to her husband's phone. "The situation is instinct with coercion—albeit colorably lawful coercion." *Bumper*, 391 U.S. at 550. Thus, while it is true that police obtained Jeff's passcode through *another source*, it is not true that officers obtained that passcode through in *independent source* (that is, a source "independent of any constitutional violation").

And the government cannot claim discovery of the contents of Jeff's phones was inevitable because Keelin provided the passcode without also proving she provided it independent of a constitutional violation. That is: it was not inevitable that Keelin would have provided the passcode had she not been compelled to do so.

11

But, even if the Court finds that the government would have ultimately gained access to the contents Jeff's phones through Keelin's provision of his passcode, it bears repeating: that would not have resulted in officers obtaining the same interview statements from Jeff. The government's claim to the contrary is pure speculation.

First, the government's claims of simultaneous information gathering are contradicted by its own evidence and arguments. According to the government, Jeff "was not in custody and free to leave during his interview." Response at 28. Yet, the recording of Keelin's interview reveals that Keelin was told Jeff "is in our custody" before a single question was asked of her. Gov't Exhibit 7. If both are true, then Keelin's interview must have begun after Jeff's arrest, which occurred after his interview. Therefore, the contents of Jeff's iPhone would not have been discovered at "the same exact time" as a result of Keelin's interview. That government cannot say with any certainty that Jeff would have made the same statements after his arrest.

In truth, the government cannot say with any certainty that Jeff would have made the same statements had *any* factor about his interview been different. The process of extracting information from a criminal suspect involves a careful dance of psychological pressure and requires a sustained focus by the interviewee. And any change of circumstances—particularly including Jeff learning that Keelin had given his private passcode to officers accusing him of child exploitation crimes—could have easily disrupted that process.

It should be noted that, after Albers and David confronted him with information they knew about his Instagram communications, Jeff had an extreme emotional reaction thinking about how that information could impact his family:

> And I feel like I've literally just ruined my entire life, my family's life, my reputation, my kids, everything, and I feel like literally I could go jump off a cliff at the moment.

Exhibit 103 at 58. And Jeff repeatedly expressed concern about Keelin learning he had sexual conversations with others. *See, e.g.,* Exhibit 103 at 42, 47, 56, 102, 123, 149. Had officers told Jeff that Keelin was talking to officers and provided his passcode, it is entirely possible Jeff would have had an emotional breakdown and been unable to complete the interview. Or been too focused on asking what Keelin knew—or said, or felt—to answer questions. Or simply become too distracted by the sheer scope of the investigation for the officers to hold his attention.

There is absolutely no guarantee that Jeff would have continued the interview or that he would have said the same things. The government is just guessing that might be the case. And that is insufficient to sustain its burden of proof. Thus, even assuming, *arguendo*, Keelin was an independent source by which officers could access the phone data, she was not an independent source for Jeff's statements and her provision of the passcode did not make Jeff's statements inevitable.

IV. **Neither GrayKey nor passcode banks make it inevitable that law enforcement would have discovered Pierce's passcode or obtained access to the contents of his phones.**

Relying on an affidavit by Detective Patrick Ladd, the government contends it would have gained access to the contents of Pierce's phones even if the interviewing

13

agents had not compelled Pierce to provide his passcode under purported authority of the warrant. Detective Ladd asserts that GrayKey—a forensic tool only available to law enforcement—would have removed Apple's encryption security feature, bypassing the need for a passcode. Gov't Exhibit 12 at 2. This, Ladd claims, would have provided access to 95% of the contents of the devices—allegedly including "pictures and messages." *Id.*

In violation of Rule 16, the government has declined to make available through discovery the information necessary to address Ladd's claims. And, for that reason, a motion to compel access to GrayKey and associated documentation is filed simultaneously with this reply. The defense incorporates by reference that motion, which explains why the government's claims of inevitable discovery through GrayKey warrant skepticism and why defense access to GrayKey is necessary to assess and respond to those claims. But, even without access to GrayKey, there appear to be gaping holes in Ladd's claims and the government's position.

First, the government's response and Ladd's affidavit leave the names of the applications through which Ladd would access pictures and messages conspicuously unspecified. And that is significant. Even if GrayKey could provide access to the iPhone photo app and the iPhone messages app, that would not assist the government in making a case against Pierce. Only if GrayKey could access the specific applications hosting the data critical to the government's case would the government's ultimate discovery of that material have been inevitable. The fact that the government knows the specific apps harboring incriminating information yet did

not assert GreyKey's ability to access those apps should inspire skepticism that this method would have "inevitably" granted access to the data the government needs.

Ladd also claims to be 100% confident GrayKey would have been able to facilitate a "brute force attack" on the iPhones and, thereby, obtain the full contents of the phones. Gov't Exhibit 12 at 3. This is a curiously high level of confidence given that Ladd does <u>not</u> claim to have been 100% successful with the brute force attacks he has conducted in the past. *Id.* Instead, he states that he has successfully completed them "many times"—not even "most times," as one might expect were his success rate over 50%. *Id.* Although Ladd is happy to estimate he has performed "250 GrayKey examinations on Apple iPhones," *id.* at 2, he does not tell the Court how many "examinations" were facilitated by successful brute force attacks. Indeed, that "examinations" number does not seem at all tied to the frequency with which Ladd has hacked into iPhones using GrayKey. Even in this case, having a passcode in hand, he conducted what might be termed a GrayKey "examination"—using GrayKey to extract data he later input into Cellebrite.

In addition, Ladd does not specify the models, iOS versions, or security settings enabled on the phones he has allegedly unlocked using GrayKey or whether they are comparable to Pierce's devices, systems, and settings. These details matter when evaluating Ladd's claims of effectiveness.

Finally, TFO Broxterman's affidavit acknowledges there are times when forensic examiners are "unable to access the contents of the device because they do not have the passcode and/or <u>the software being used cannot bypass the passcode</u>."

Exhibit 3 at 3 (emphasis added). This strongly indicates what seems apparent from Ladd's affidavit—that GrayKey is not always successful at bypassing security features. (If it was, Broxterman's affidavit would have specified that this occurs only instances where GrayKey is unavailable.)

Having repeatedly implicitly acknowledged that GrayKey is <u>not</u> always successful at hacking into iPhones or at obtaining all the data it would need to make its case, the government asserts that it still would have obtained the contents of Pierce's phones by testing passcodes from a "passcode bank"—a list of numbers law enforcement officers suspect someone might use on his phone. *Id.* at 39; Exhibit 3. But the government omits that iPhones traditionally only allow ten failed passcode attempts before the phone becomes permanently disabled or factory resets. While Broxterman claims the ultimate passcode would have been included in the "passcode bank," he is not so audacious as to assert that it would have been among the first codes tried. So this theory does not make it inevitable that law enforcement would have unlocked Pierce's phone, but only possible—if (and this is a big if) they happened to guess the correct password within the first ten attempts.

It appears the affidavits from the government's witnesses have been carefully crafted to give an impression of certainty while obscuring potentially unfavorable facts behind their claims. To the extent this Court finds the government's claims of inevitable discovery persuasive, then it must afford the defense the opportunity to competently address them. And that requires granting the defense access to GrayKey. Only if a defense expert is permitted to evaluate and test Ladd's claims

can defense counsel adequately prepare to cross-examine him. This is the only way to ensure the Court is presented a complete picture of GrayKey's capabilities as they pertain to the phones at issue in this case—and the only way to evaluate whether it is more likely than not the government inevitably would have secured the evidence from Pierce's phones despite the fact that it was actually obtained through official misconduct.

                                Respectfully submitted,

                                Joseph, Hollander & Craft LLC
                                *Attorneys for the Defendant*

By:    s/ Christopher M. Joseph
         Christopher M. Joseph, #19778
         Carrie E. Parker, #24988
         1508 S.W. Topeka Blvd.
         Topeka, Kansas 66612
         (785) 234-3272
         (785) 234-3610 fax
         cjoseph@josephhollander.com
         cparker@josephhollander.com

## CERTIFICATE OF SERVICE

      I hereby certify that on March 12, 2020, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

                                      s/ Christopher M. Joseph
                                      Christopher M. Joseph