IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>JEFFREY DAVID PIERCE,<br><br>*Defendant.* | Case No. 20-40068 |

**REPLY IN SUPPORT OF
MOTION TO COMPEL DISCOVERY**

I.   **GrayKey is material to preparing Pierce's defense.**

   A.   **By heralding GrayKey as the basis for its inevitable discovery argument, the government has made GrayKey material to the resolution of the Defendant's suppression motion.**

The prosecution's response brief is right about one thing: the only reason the Defendant has asked for the GrayKey device and related items is to further the litigation of his suppression motion.

Pierce filed a motion seeking suppression of evidence derived from his iPhone XS Max and iPhone 5s as a direct result of officers' deliberate misconduct. The government responded, asserting inevitable discovery. Specifically, the government contends it inevitably would have gained access to the contents of Pierce's phones using GrayKey. Doc. 37, Government's Brief in Opposition at 37.

The defense has provided numerous reasons to doubt that GrayKey would have been able to access the evidence it intends to offer at trial, including:

- Sworn testimony that:

- o GrayKey cannot access 100% of Apple devices;
- o The amount of data that can be obtained by mobile device forensic tools ("MDFT")—including GrayKey—often depends on whether the device is in AFU or BFU mode, with decreased data access for devices in BFU mode;
- o Facts suggest that Pierce's phones were in BFU mode before Pierce's passcode was unlawfully compelled; and
- o Of the Apple devices GrayKey can access, roughly 10% cannot be accessed without a user's passcode—even when they are in AFU mode.
- News reports that:
  - o Apple has released updates to its operating system to block GrayKey from doing exactly what the government claims he would have been able to do and GrayKey's manufacturer, GrayShift, confirmed Apple's efforts were successful at preventing GrayKey from hacking into iPhones; and
  - o Since the summer of 2018, all Apple devices automatically enable "USB Restricted Mode"—a setting directed at "preventing devices like the GrayKey box used by law enforcement to brute force [the] passcode" by disabling the iPhone's lightning port one hour after the phone is last locked.

The government has not refuted *any* of this.

Although the prosecution secured an affidavit from David Miles, the founder, owner, and CEO of Grayshift, even he doesn't claim that his company's product would have been able to unlock the iPhones at issue in this case. Rather, his affidavit offers generic claims about GrayKey's capabilities that are not tied to the model or software version of the phones at issue and that apparently are not tied to the software version(s) available to law enforcement when the phones were seized, like:

- GrayKey can unlock iOS devices in "many"—but apparently not the majority—of instances;
- GrayKey can obtain "differing levels of data" from iOS devices when law enforcement officers do not have the passcode; and
- GrayKey "can attempt a brute force" unlock, but iOS devices are equipped with security features to try to prevent such attacks.

The strongest claim Mr. Miles makes is that "GrayKey's technology has the ability, in most instances, to overcome these security features." But, even assuming GrayKey can overcome security features in "most instances" when it is used, "most instances" in which the technology is used do not necessarily match the circumstances of this case. Mr. Miles's affidavit stops far short of the issue here: whether GrayKey's technology would have granted access to the critical evidence government obtained from Pierce's iPhone XS Max and iPhone 5s—both of which were likely in BFU mode and one of which was operating with Apple's most advanced security features.

In sum: The government asks this Court to deny Pierce's suppression motion on the assertion that discovery of the evidence it actually obtained unlawfully was "inevitable." Pierce has a well-founded basis for disputing the prosecution's inevitable discovery claim. It is a claim that can be tested and, thereby, verified or refuted. And the discovery he seeks is necessary to do that. Therefore, the GrayKey device and information necessary to operating it are material to resolution of the suppression motion. And, by asserting its inevitable discovery argument, the government has made them material.

### B. Items and information that are material to the suppression motion are "material to the defense" as that phrase is used in Fed. R. Crim. P. 16.

Because it strains credulity to assert that the requested information is immaterial to resolution of the suppression motion, the government takes an additional tack. Relying on *United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480 (1996), the government contends the requested discovery is not "material to preparing the defense" as that phrase is used in Fed. R. Crim. P. 16. The *Armstrong* case addressed a request for discovery on a claim that the prosecuting attorney singled out the defendant for prosecution on the basis of his race. 517 U.S. at 458. Resolving that issue, and that issue only, the court held that "Rule 16(a)(1)(C) authorizes defendants to examine Government documents material to the preparation of their defense against the Government's case in chief, but not to the preparation of selective-prosecution claims." *Id.* at 463.

Multiple justices wrote separately to emphasize the limited scope of the holding. Justice Souter said, simply: "I join the Court's opinion, but in its discussion of Federal Rule of Criminal Procedure 16 only to the extent of its application to the issue in this case." Justice Ginsburg explained:

> [T]he Court has decided a precise issue: whether the phrase "defendant's defense," as used in Rule 16(a)(1)(C), encompasses allegations of selective prosecution. I agree with the Court, for reasons the opinion states, that subdivision (a)(1)(C) does not apply to selective prosecution claims. The Court was not called upon to decide here whether Rule 16(a)(1)(C) applies in any other context, for example, to affirmative defenses unrelated to the merits.

*Id.* at 471. And, when confronted with the same argument the government presents in this case, the Ninth Circuit Court of Appeals—the only federal appellate court to have addressed this argument—concluded that "the holding of *Armstrong* applies to the narrow issue of discovery in selective-prosecution cases." *See United States v. Soto–Zuniga*, 837 F.3d 992, 1000-1001 (2016).

While discovery pertinent to selective-prosecution claims does not assist in the preparation of a defense against the government's case-in-chief, discovery related to the constitutionality of a search or seizure does. When used in litigating a suppression motion, such discovery is critical to the government's case-in-chief. Indeed, it can be the factor that determines what evidence can be presented in the government's case-in-chief and what cannot. *See id.* at 1001-1002 (distinguishing *Soto–Zuniga* from a case in which discovery was denied because "[b]y contrast, Soto–Zuniga sought discovery of whether he and his automobile were unconstitutionally seized at the San Clemente checkpoint—an issue that is central to his defense,

because it could spell the difference in a suppression motion of the key physical evidence against him.").

A situation nearly identical to the one before this Court was presented in *United States v. Wilford*, 961 F.Supp.2d 740, 756 (D.Md. 2013). The defendant had filed a suppression motion, and the government had filed a response. The government's response asserted that—even assuming a Fourth Amendment violation occurred—suppression was unwarranted under the *Leon* good faith doctrine. Finding that the information the defendant sought was pertinent to refuting the prosecution's good-faith argument, the court determined Rule 16 required its disclosure. *Id.* at 756.

In reaching its holding, the court recited the same materiality principles featured in the government's response brief:

> "For the defendant to show materiality under this rule, '[t]here must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor.' " *United States v. Caro*, 597 F.3d 608, 621 (4th Cir.2010) (citation omitted). For example, " '[e]vidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.' " *Caro*, 597 F.3d at 621 (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C.Cir.1993)).

*Id.* at 755; *compare* Doc. 45 at 6. And it concluded information pertinent to the resolution of a suppression motion—in particular, information material the prosecution's response in opposition—checks those materiality boxes. *Id.* at 756. Indeed, few things can alter the "quantum of proof" in a defendant's favor more than

6

a successful suppression motion. *See id* ("information material to the Motion to Suppress, although sought in connection with a pretrial proceeding, might alter the 'quantum of proof' in Wilford's favor if the suppression motion were successful").

Here, the defense has moved to suppress evidence. The prosecution has responded that, even assuming a Fourth Amendment violation occurred, suppression is unwarranted. Just as the *Wilford* court ordered that the defense was entitled to discovery pertinent to the prosecution's assertion of the good faith doctrine, this Court should order that the defense is entitled to discovery pertinent to the prosecution's assertion of the inevitable discovery doctrine.

Finally, the government claims this case is distinguishable from *United States v. Budziak*, 697 F.3d 1105 (2012), because the discovery requested in *Budziak* was pertinent to a trial defense rather than a suppression motion. But the government misses that the *Budziak* decision <u>relied on a suppression case</u>:

> In *United States v. Cedano–Arellano*, 332 F.3d 568 (9th Cir.2003), we held that the defendant was entitled to discovery on the narcotics detector dog that "alerted" on his gas tank, id. at 570, because materials on the dog's qualifications "were crucial to his ability to assess the dog's reliability, a very important issue in his defense, and to conduct an effective cross-examination of the dog's handler." *Id.* at 571. Similarly, access to the EP2P software was crucial to Budziak's ability to assess the program and the testimony of the FBI agents who used it to build the case against him. Like the competency of the drug-sniffing dog in Cedano–Arellano, the functions of the EP2P software constituted a "very important issue" for Budziak's defense.

*Budziak*, 697 F.3d at 1112. A drug dog's reliability is never an issue at trial, but only an issue in determining the constitutional validity of a search undertaken on the basis of the dog's alert. And, when the constitutional validity of a search may

determine what evidence will be suppressed or available for the government to use at trial, it is a "very important issue" on which a defendant is entitled to discovery. *See Cedano–Arellano*, 332 F.3d at 571 (citing *United States v. Armstrong*, 517 U.S. 456, 462–63, 116 S.Ct. 1480 (1996), and Fed. R. Crim. P. 16 in its analysis). The same is true here with respect to GrayKey and Pierce's discovery request.

II. **The Defendant requests and the government must provide materials within its possession, custody, and control.**

The government's claim that it does not possess or control the items the defense has requested is a red herring.

While the government has elected to focus on the trees while feigning ignorance of the forest, the objective of the Defendant's discovery request is clear: the defense expert needs access to the GrayKey device, the stuff that makes the device work (portals, software, etc.), and sufficient information (manuals and change logs, etc.) to enable the defense expert to operate it so that she can test the government's claims that, using GrayKey, agents inevitably would have accessed the full contents of the Defendant's iPhones. The government has possession, custody, and/or control over all the materials necessary to test its claims about GrayKey's alleged ability to have inevitably accessed the full contents of the Defendant's iPhones. And the defense is only asking for access to the technology and information the government's agents and officers actually have and continue to use on phones every day.

For instance, if the government no longer has access to software version 1.6.7.9, it can grant access to the software version it has now (or at the time the

8

defense expert is granted access). And, to the extent it is necessary to evaluating the government's inevitable discovery argument, it can provide technical manuals and change logs regarding relevant differences in the versions. To the extent more is needed that is not in the government's possession, custody, or control, the defense will subpoena it from GrayKey.

But the government is not absolved of its discovery obligations by virtue of contractual agreements it makes with private third-parties. For example, the Court surely would not find the identity of a confidential informant was permanently secured from disclosure merely by virtue of the fact that a government agent and the confidential informant agreed that should be the case. Such agreements, while perhaps relevant to evaluating whether the requested items are subject to a law enforcement privilege, do not affect the determination of whether the government possesses, has custody of, or controls a technology it actually operates day in and day out.

### III. Qualified law enforcement privilege does not apply.

The decision of whether the government may withhold material information under a law enforcement privilege depends on a case-by-case balancing analysis. *Roviaro v. United States*, 353 U.S. 53, 62 (1957). And "[w]here the disclosure . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60-61.

At stake for the Defendant is his liberty. Pierce faces a lifetime of imprisonment if convicted of the charges against him—charges the government seeks

to prove with evidence obtained through deliberate police misconduct, based on a detective's assertion that GrayKey "would have" given him access to all the same evidence. The detective makes this claim even though: (1) that detective hasn't tested his theory; (2) law enforcement officers reportedly aren't even privy to the "broad contours" of how the GrayKey technology works; and (3) the defense has presented ample information indicating that the detective's claim is so suspect that independent testing is necessary.

While the government asserts that "releasing [the information the defense seeks] will educate the public and adversaries on how to prevent law enforcement from successfully extracting the contents of cellular phones" thereby frustrating "countless future investigations" and "allowing criminals to walk free," it significantly overstates the risks it faces. The defense does not seek to "release" anything—particularly not to the public. It only wants to test the government's inevitable discovery assertions. The defense understands it will have to do so under strict confidentiality and nondisclosure requirements—much like what the thousands of GrayKey customers are already subject to.

Citing *United States v. Jean*, 2016 WL 6886871, *7 (W.D. Ark. 2016), the government dramatically claims that "mere knowledge by the defendant's expert or defense attorneys of the particular vulnerabilities exploited by the GrayKey device will place the public at risk." But the concerns present in *Jean* simply do not exist here. And there is an exponentially greater likelihood the requested discovery will assist the defense in this case.

In *Jean*, the defendant requested the exploit code for the Network Investigative Technique ("NIT") the FBI developed to identify users of the child pornography website known as Playpen by surreptitiously extracting information from their computers:

> The FBI developed certain computer code, which it dubbed a "Network Investigative Technique" ("NIT"), that would surreptitiously deploy when a Playpen user would log into the website using a username and password, and begin downloading an image of child pornography. The NIT would then cause the user's computer to send back to the FBI certain content-neutral identifying information, including the computer's type of operating system, the computer's host name and operating system username, the computer's media access control address, and a unique identifier generated by the NIT. The user's return of this "packet" of information was sent to the Government's computer over the regular internet—which had the intended side effect of revealing the user's true IP address, because IP addresses are attached to every packet of information exchanged over the regular internet. With the user's true IP address came the FBI's ability to determine the actual identity and location of the suspected Playpen user. The FBI's NIT was able to do all this by first exploiting a defective window, i.e., a non-publicly-known vulnerability, [redacted text].

*Id.* at *2. The district court concluded knowledge of the code the FBI used to build the exploit could "could potentially lead the expert to later build his own exploit, or assist others in doing so, thereby effectively circumventing a protective order." *Id.* at *7. Balancing this risk against the fact that the defendant's requested the information to test a "virtually impossible hypothetical situation,"[1] the *Jean* court determined the government's interest in maintaining the confidentiality of the information outweighed the potential benefit to the defendant. *Id.*

---

[1] A government agent actually tested the hypothesis underlying the defendant's discovery request and proved it wrong. *Jean*, 2016 WL 6886871, *6.

By contrast, Pierce is not asking for *any* code. Therefore, unlike the defense expert in *Jean*, Pierce's expert will not have the information necessary to reverse engineer the GrayKey technology. And, unlike the *Jean* defendant, Pierce is not on some wild goose chase in hopes that a "virtually impossible hypothetical situation" might turn out in his favor. *Id.* at *7. Rather, based on GrayKey's known capabilities, Apple's known security features, and the specifics of the phones in this case, there is a reasonable likelihood he will be able to show that GrayKey did not make discovery of the evidence at issue "inevitable."

Also, unlike the technology at issue in *Jean,* the GrayKey technology has already been widely distributed and—so far, it seems—remained sufficiently protected by confidentiality and nondisclosure agreements. The government has failed to explain why defense counsel and the defense expert—who would be subject to disciplinary action against their licenses, contempt penalties, and extraordinary civil damages claims if they disclosed the requested information in violation of court orders—are more dangerous custodians of the information they seek than the detectives entrusted to care for the same information solely under threat of civil damages claims.

More importantly, the government has failed to explain how that risk outweighs the Defendant's interest in obtaining information could swing the evidentiary landscape at trial dramatically in his favor. When an issue is critical to his defense, no defendant "should not have to rely solely on the government's word

that further discovery is unnecessary." *Soto–Zuniga*, 837 F.3d at 1002 (quoting *Budziak*, 697 F.3d at 1113).

Because access to the requested materials is essential to a fair determination of the suppression motion, any interest the government has in preventing its disclosure must give way. *Roviaro*, 353 U.S. at 60-61.

        Respectfully submitted,

        Joseph, Hollander & Craft LLC
        *Attorneys for the Defendant*

By:    s/ Christopher M. Joseph
        Christopher M. Joseph, #19778
        Carrie E. Parker, #24988
        1508 S.W. Topeka Blvd.
        Topeka, Kansas 66612
        (785) 234-3272
        (785) 234-3610 fax
        cjoseph@josephhollander.com
        cparker@josephhollander.com

## CERTIFICATE OF SERVICE

  I hereby certify that on April 22, 2021, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all counsel of record.


            <u>s/ Christopher M. Joseph</u>
            Christopher M. Joseph