**In the United States District Court
for the District of Kansas**

———————

Case No. 20-cr-40068-TC

———————

UNITED STATES OF AMERICA

v.

JEFFREY DAVID PIERCE

**MEMORANDUM AND ORDER**

Jeffrey Pierce is charged with several counts of production, distribution, and possession of child pornography, in violation of 18 U.S.C. §§ 2251–52, and one count of coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b). He moves to suppress the contents of his cell phones and of certain incriminating statements on the theory that investigators violated the scope of their search warrant and improperly compelled him to provide his phone passcode. Doc. 31. For the following reasons, Pierce's motion is denied.

**I**

**A**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Searches and seizures—of people, their homes, and their personal property—are presumed unreasonable when conducted without a warrant. *United States v. Karo*, 468 U.S. 705, 717 (1984). For a warrant to be valid, it must be supported by probable cause and must "particularly describ[e] . . . the persons or things to be seized." *United States v. Leary*, 846 F.2d 592, 600, 605 (10th Cir. 1988) (quoting U.S. Const. amend. IV) (alteration in original). Searches that exceed a valid warrant's scope become invalid. *Cf. Marron v. United States*, 275 U.S. 192, 196 (1927) (prohibiting "the seizure of one thing under a warrant describing another"); *Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 394 n.7 (1971); *Leary*, 846 F.2d at 600.

1

The Fifth Amendment has a different focus. It provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. It prohibits the State from bringing its powers to bear on individuals such that they are compelled to make incriminating, testimonial communications about themselves. *See Fisher v. United States*, 425 U.S. 391, 408 (1976).

Once a defendant has shown that the Fourth or Fifth Amendment is implicated, *see United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020), it becomes the prosecution's burden to prove the reasonableness of any search, *id.*, and the voluntariness of any statements, *see United States v. Young*, 964 F.3d 938, 943 (10th Cir. 2020).[1]

**B**

**1.** On September 1, 2020, the Federal Bureau of Investigations obtained a warrant permitting the search of Pierce's home and personal property, including electronic devices. That warrant expressly incorporated an Attachment B, which permitted the search of cell phones "in accordance with the procedures set forth in the affidavit submitted in support of this warrant." Doc. 31 at 3; Doc. 38 at 2, 6, 10. The affidavit, in turn, allowed law enforcement to compel the use of a detainee's biometrics (*e.g.*, facial recognition or thumb prints) to unlock phones but expressly did "not authorize law enforcement to *compel* that the device owner state or otherwise provide the password" to any device. Doc. 38 at 33, ¶ 12(h) (emphasis added); *see also* Doc. 31 at 3.

On September 2, 2020, FBI agents and task force officers, together with officers from the Topeka Police Department, executed the warrant. One team searched Pierce's home and interviewed his wife, Keelin Pierce, while a second team separately intercepted Pierce as he drove to work.

---

[1] The parties presented evidence at a hearing on September 28, 2021. Defendant Pierce appeared in person and through counsel. The Government presented testimony from six agents and officers involved in the Pierce investigation, from both the FBI and the Topeka Police Department. Pierce presented testimony from his forensic expert and from his spouse. In addition to those exhibits submitted with the parties' pleadings, *see* Docs. 34 & 37–38, four additional exhibits were offered and admitted into evidence. Gov. Exs. 13 & 14; Def. Exs. 104 & 105. The parties largely agree on the facts, disagreeing primarily about their effect.

**a.** After stopping Pierce's vehicle, FBI task force officers directed him to get out, presented a search warrant for his person and vehicle, and executed the searches.[2] After locating an iPhone XS in Pierce's pocket, agents advised Pierce of his *Miranda* rights and presented him with a waiver form. Pierce indicated his verbal understanding and, on the form, gave his written consent to "[a]t this time . . . answer questions without a lawyer present." Doc. 37-3.

Agents asked Pierce if he wanted to sit in their vehicle while continuing to talk. He sat in the front passenger seat, with Task Force Officer Albers in the driver's seat and Special Agent Davis in the back. Albers asked whether Pierce could think of anything that would cause law enforcement to want to talk with him. Pierce responded: "You guys enlighten me." Immediately after, this exchange occurred:

> **Albers:** Okay. All right. So, um, I did notice that you have, uh, a phone with you, right?
>
> **Pierce:** Mm-hmm.
>
> **Albers:** Okay. Um, what's the...what's the passcode on that phone?
>
> **Pierce:** I don't think I'll give that out unless I'm forced to on something obviously.
>
> **Albers:** Okay, yeah, just, uh, just so I kinda know where you're coming from, what's the...what's the reasoning?
>
> **Pierce:** Well, first of all, Fourth Amendment would be the big one.
>
> **Albers:** Okay.
>
> **Pierce:** That nobody can just go through any of my property without proper due process would be number one.
>
> **Albers:** Sure. Okay. Uh, any...any other concerns or...
>
> **Pierce:** No.
>
> **Albers:** So, just the...the Fourth Amendment?

---

[2] The Government contends that Pierce was not in custody at this point or at any point during his interview. Doc. 37 at 28. Pierce has not argued otherwise. *See* Docs. 34 & 39.

3

**Pierce:** Yeah.

**Albers:** Okay. Um, so...

**Pierce:** I mean, I hope... I guess on top of that too, nobody ever really showed me a search warrant too.

**Davis:** I've got one right here.

**Albers:** Yeah.

**Pierce:** Can you show me, like, what it's all for or...

**Albers:** Yeah, yeah...

**Pierce:** I guess just the paperwork so if I'd like to just [inaudible], I'd like to know, to be honest with you.

**Albers:** Yeah. You bet. So, I ... I'll give you a second to kind of review that.

**Pierce:** So, when it says, like, "searching," that's, like, I ... I don't know how any of this works.

**Albers:** Mm-hmm.

**Pierce:** Like, you're searching the whole house? All the vehicles? I don't understand what that means.

**Albers:** Yeah, so, our ... our ... Yeah, our goal is, um, uh, right now it's kinda broad, um, and what we attempt to do is kinda narrow it down because obviously, um, people...other people in the house have...have devices that we may not necessarily need, um, but we don't know that until we talk with people. Um, so, right now, it's kinda broad, but with a little cooperation, we're able to kinda narrow it...narrow it down to the...the specific, uh, items that ... that we may be, uh, in need of. Um, so, yeah, it's ... it's ... it's for the entire house, for all electronic devices, um, uh.

* * *

**Pierce:** I don't understand [inaudible].

**Albers:** All right. [Laughter]

**Davis:** There will be a copy left for you at the residence so you can definitely take a look at it afterwards too.

**Pierce:** Okay.

4

> **Albers:** We'll make sure everything...
>
> **Pierce:** How long does that take at the house? Because obviously she needs to get to work too, and...
>
> * * *
>
> **Albers:** Okay. So [ . . . ] if she's gotta go to work, she can go to work or ... or whatever, so. Um, I ... I ... I can speak for many people that we work with that we try to accommodate as much as possible, um, uh, and empathize with ... with people and situations, so. Um, so, yeah, I don't ... I don't foresee it being ... being a lengthy process. Um, as ... as ... as far as your ... your phone, um, uh, you know, we will have to take a look at it, based on some information that ... that we've received. So, whether you wanna give us the passcode or ... or we obtain it, um, through a different way, it ... it's up to you, but, um, a little cooperation goes a long way. Um, you were worried about the Fourth Amendment, the ... and the search warrant does cover your ... your phone, so there is legal ... legal process with that, okay? Um, I noticed there's ... there's a four ... four-digit code.
>
> **Pierce:** It ... it ... I don't even remember what it is, I use face recognition on it, so I have no idea.

Doc. 34-3 at 6–10; Doc. 38-6 at 7–11.[3]

At this point, Task Force Officer Moore, who had been listening to the interview from his own vehicle, approached, holding Pierce's iPhone.

> **Moore:** Hi there. I don't know if you noticed on the warrant, but it does include your biometrics.
>
> **Pierce:** Okay.
>
> **Moore:** So, that which...basically what that means is we can use your facial recognition to get into the phone, okay? So

---

[3] These documents are identical transcripts of Pierce's interview (the former is Defendant's exhibit and the latter is the Government's). The audio was submitted as Doc. 38-5. Hereinafter citations to the transcript will be only to Doc. 34-3.

that's what we're gonna go ahead and do. Okay. Now, on your phone ...

[inaudible crosstalk]

**Pierce:** It doesn't...it doesn't always work to where it's...

**Moore:** Okay. Listen. Okay, I ... I do this for a living so I know that after a certain time goes by, you have to enter your passcode to enable facial recognition, okay? So, I ... I know you know your password, okay. I ... I really don't wanna make ...

**Pierce:** Well, probably soon if I guessed, yeah.

**Moore:** Listen. I don't wanna make this any harder than it has to be, okay? We're the FBI. We're gonna get into your phone. Okay? All we have to do is drive this phone to our forensic lab and they're gonna unlock it for me in a couple hours. All right? Like he said — a little cooperation goes a long way. All right? I don't know everything you're into, all right? But we're ... I've done police work in one way, shape, or form for 16 years, okay? He's right — a little cooperation does go a long way. Okay? And, you know, like he said that, you know, this involves your house and your wife and your kids and stuff like that, so the more we can, you know, figure out what's going on, the easier it's gonna be on all them.

**Pierce:** So, a search warrant on a phone isn't a separate thing. It's on that search warrant?

**Davis:** Yes, it's on the search.

**Albers:** Yeah, the search warrant is covering everything including...including your cars.

\* \* \*

**Moore:** All right. So, what...what is your passcode for this phone so we can speed this along a little bit?

**Pierce:** I'll put my face on it. I ... I usually use my face. I ...

\* \* \*

**Moore**: ... it's ... you've got it to where you have to put the passcode in to enable your face. Okay? So, I know you know the passcode to this phone.

6

> **Pierce:** Well, I ... It's either one of two things.
>
> [inaudible crosstalk]
>
> **Moore:** Go ahead and type it in.
>
> **Pierce:** There you go.

Doc. 34-3 at 10–13. By comparing the time that Pierce signed his waiver-of-rights form (7:33 a.m., or minute mark 4:52 of his interview) with the point in his interview at which Pierce provided this passcode (minute mark 16:47), the Government was able to show that Pierce surrendered this passcode sometime between 7:44 a.m. and 7:45 a.m.

Taking the unlocked iPhone, Moore returned to his vehicle, while Albers and Davis continued their interview. Although Moore and the iPhone were no longer present this portion of the interview began with Albers telling Pierce that Moore was conducting a concurrent search of the phone. Doc. 34-3 at 14 ("[H]e's starting [to] look at your phone …. [W]hat is on the phone [that] you think we would, uh, be interested in [as] it relates to, uh, child exploitation matters?"). Pierce then spoke with the investigators for over two hours and made several inculpatory statements. Questioning during this portion of the interview was guided, in part, by materials the FBI had obtained via subpoenas to AT&T and Comcast, as well as information obtained from Pierce's alleged victims. *See* Doc. 37 at 21–22 (summarizing transcript's contents). But in addition to those materials, Albers and Davis made frequent references to Moore's ongoing, real-time examination of Pierce's phone. *See, e.g.*, Doc. 34-3 at 21–22, 38, 56, 89, 92–93, 94, 156.

Shortly before the three-hour mark, Moore approached the vehicle again to question Pierce about his use of an iPhone application known as Grindr.[4] *See* Doc. 34-3 at 108. Moore's questions were premised directly on the contents of Pierce's unlocked iPhone, and they elicited more inculpatory statements. Doc. 34-3 at 117–26. The interview with Davis and Albers then continued for another hour.

---

[4] Grindr is reported to be the largest location-based social networking and dating application for gay, bisexual, transgender, and queer people. *See United States v. Wise*, Case No. 20-102, 2021 WL 5016013, at *1 n.1 (D.N.J. Oct. 28, 2021) (slip op.). Agents' interest in Pierce's use arose from concern that he had used the application to communicate with underage persons. *See, e.g.*, Doc. 34-3 at 115.

During the interview, other officers searched Pierce's vehicle and recovered another phone, an iPhone 5. About three-and-a-half hours into the interview, Davis asked Pierce for the passcode to that phone, and Pierce confirmed it had the same code as the iPhone XS. Doc. 34-3 at 137–39. A TPD detective who specializes in cell phone forensic examinations subsequently examined both iPhones using GrayKey— a law-enforcement-use-only forensic device. GrayKey was not, however, used to open the phones, which were unlocked for the examination using the passcode that Pierce provided.

**b.** At the same time that Albers, Davis, and Moore were interviewing Pierce, another team of investigators was searching Pierce's home and interviewing his wife, Keelin Pierce.[5] The team arrived in force, blocked the driveway, and conducted an armed sweep of the residence. They also prevented Keelin from calling her office until they had completed their initial activities in the home. Pursuant to the warrant—the validity of which Pierce has not challenged—officers collected Keelin's phone along with the other electronics in the home and did not allow her to use any of those devices without their supervision.

Keelin, the principal of a local school who was preparing to leave for work, testified about how the officers overwhelmed her and her home. She also testified that the officers did not tell her she was free to leave. Still, Keelin gave them permission to conduct a recorded interview of her, and that recording shows that agents expressly informed Keelin that she was free to end the conversation and leave the home at any time:

> You can walk out of this house at any time and say, ". . . I don't want to talk to you any more or anything." We'd be glad to explain everything to you. And we've got some other information to share with you as well. But at any time you go, "You know what I'm done, I want to go to my kids, I want to do whatever." We do have a search warrant for the house, so we will be here for a little while. So at any time, if you want to leave and end the interview, you're free

---

[5] For purposes of clarity, this Memorandum and Order will refer to Ms. Pierce as "Keelin" to avoid any confusion with Defendant Pierce.

> to leave, you're not under arrest, you're not going to jail today. Any of those kinds of things, that make sense?

Doc. 38-4; *see also* Ex. 104 at 3. Although there is little doubt that Keelin, as she testified, felt extreme emotion during this interview, the audio recording shows that both she and investigators maintained a calm tone, speaking softly and unhurriedly. Investigators answered Keelin's questions; she answered theirs; and no one raised his or her voice, threatened adverse consequences, or overtly attempted to escalate the situation.

Over the next 15 minutes, Keelin answered several questions relevant to the current motion to suppress, including one about Pierce's iPhone passcode. She stated that it was "just the end of his phone number." Doc. 38-4; *see also* Ex. 104 at 7. Again by reconstructing timelines (using Keelin's 7:38 a.m. call to her office as a reference point), the Government presented evidence that Keelin provided Pierce's passcode between 7:42 a.m. and 7:43 a.m., approximately two minutes before Pierce himself provided the passcode.

Keelin spoke with investigators for about an hour. She then indicated that she wished to terminate the interview by asking whether she "could go . . . to [her] family now." Investigators immediately responded, "Absolutely." They then asked her to wait for a few minutes so that they could finish with her cell phone and let her leave with it. They did not, however, ask her any more questions while completing their review of her phone. Doc. 38-4; *see also* Ex. 104 at 29.

Although Keelin's interviewers did not contemporaneously share the passcode with Pierce's interviewers, testimony established that that would have been standard practice if Pierce had not already provided it. Specifically, several of these agents testified that—when a person declines to provide their passcodes or other vital information—standard procedure is to contact the person's spouse, intimate partner, or other close relations to try to obtain the passcode from them. Special Agent Forgues-Schlenker, one of Keelin's interviewers, testified that he keeps his phone's ringer turned up and periodically checks his phone during interviews precisely because he knows that information often needs to be passed among investigative teams. Davis, who was in the vehicle with Pierce, testified that contacting Keelin's team would have been the next step if Pierce had refused to provide his passcode. Davis could not testify as to when this would have occurred (*i.e.*, during

or after Pierce's interview concluded), because it would have been Moore—who was listening to Pierce's interview from his own vehicle—who would have made that call. But Moore himself testified that, per his standard practice, if Pierce had refused to provide his passcode, Moore would have promptly called the agents with Keelin while Davis and Albers continued their interview of Pierce.

**2.** The Government ultimately charged Pierce with engaging in a series of electronic communications, mostly by way of his iPhones, that constitute production, possession, and distribution of child pornography. *See* Doc. 25. Pierce moved to suppress the cell phone evidence and the inculpatory statements made during his initial interview because, he contends, agents violated their search warrant by improperly compelling him to provide his iPhone passcode. *See* Doc. 31. The Government, in addition to arguing that it did not violate Pierce's rights, argues that suppression is unwarranted for three reasons: there was an independent source for the passcode (Keelin), the investigators acted in good faith, and the passcode's discovery was inevitable. *See* Doc. 37.

This last argument—inevitable discovery—raised fact questions about the Government's technological capabilities. Essentially, the Government argued that even without the passcode, GrayKey would have unlocked or otherwise permitted unfettered access to Pierce's iPhones. Doc. 37 at 36–37 (claiming an ability to obtain 95 percent or more of the data through GrayKey).[6] While other software programs can deliver similar results if an iPhone is in a certain status (known as AFU, which stands for "after first unlock"), Pierce and his forensic expert, Michelle Bush, contended that such success is highly questionable when the iPhone is in a different status (known as BFU, which stands for "before first unlock"). Doc. 40. Bush has based her opinions on the complexity and pervasiveness of Apple's security systems and the capabilities of similar programs available on the market. *See* Doc. 40.

To verify GrayKey's capabilities, Pierce moved to compel the Government to permit testing of GrayKey and its limitations. Doc. 40 at 4–5. The information Pierce sought was material to Pierce's defense

---

[6] At subsequent hearings, the Government clarified that it is only claiming inevitable discovery, via GrayKey "brute force attack," for Pierce's iPhone 5, and not for his newer-model iPhone XS.

and subject to production under Fed. R. Cr. P. 16(a)(1)(E). *See* Doc. 48. But given the highly confidential nature of the GrayKey technology—and the legitimate interests in keeping it confidential—the scope and manner of this production was limited. Doc. 48. The parties were asked to confer on appropriate limitations but could not agree on the scope or format of the testing and, as a result, submitted separate proposed protocols for production and testing. Docs. 53–54. At a hearing on July 14, 2021, *see* Doc. 55, the Court adopted the Government's proposal with one exception: that defense counsel be permitted to take notes on testing, subject to a protective order.

Consistent with these protocols, Bush and counsel for both parties observed a demonstration wherein GrayKey personnel plugged Pierce's iPhone 5 into a GrayKey device. The GrayKey device was not the same physical device that the TPD used to conduct its original examination of Pierce's phone but operated the same version of GrayKey software used in September 2020. Pierce's iPhone 5 was in BFU mode during the test, and after booting up, it took the GrayKey device approximately 21 seconds to correctly identify Pierce's four-digit passcode. *See* Exs. 13 & 14.

## II

Pierce's motion to suppress is denied. Two independent bases preclude relief.[7] First, the Government did not improperly compel Pierce to testify against himself. Second, the Government has sufficiently established that Pierce's wife, Keelin, independently, voluntarily, and contemporaneously provided Pierce's passcode.

## A

Pierce argues that law enforcement officers unlawfully obtained his iPhone passcode. Specifically, he contends that they told him the warrant required him to provide the passcode to them when, in fact, the warrant expressly stated that officers could not "compel that the device owner state or otherwise provide the password or any other means that

---

[7] The Government also asserts that suppression is not required because it would have inevitably obtained Pierce's passcode by use of the GrayKey technology and, in any event, operated in good faith. Doc. 37 at 2–3. Those arguments need not be reached because Pierce's and Keelin's disclosures of the passcode were permissible.

11

may be used to unlock or access the devices." Doc. 31 at 1, 10–11. That misrepresentation, Pierce contends, "created a situation in which it became impossible for Pierce to offer this passcode consensually," and his statements were therefore compelled in violation of the warrant. Doc. 31 at 12–13 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548–50 (1968)). That argument fails for several reasons.

First, the officers did not mislead Pierce into believing that the warrant required him to provide the passcode. The transcript of the encounter confirms that the officers asked Pierce for his passcode, and he indicated that he would not provide it because, among other things, there was not a warrant permitting the search of his phone. In response, the officers produced the warrant authorizing the search of his phone. After giving Pierce an opportunity to review the warrant, the officers answered questions that Pierce had about the warrant's execution at his home.

One of the things that officers discussed with Pierce was biometrics. The officers accurately advised Pierce that the warrant authorized them to obtain Pierce's biometrics to open the phone. Once Pierce complied with their instructions to use his facial biometrics and they failed to open the phone, the officers explained that the iPhone required the passcode to unlock. At this point, the officers explained that if Pierce did not cooperatively provide the passcode, to expedite the process for him and his family, the officers would take the phone to their local facility and would unlock it using the tools at their disposal. At that point, Pierce voluntarily provided the passcode.

While Pierce claims that the officers falsely told him that the warrant "required him to provide" the passcode, Doc. 31 at 13, he points to nothing in the transcript that supports his claim. That failure renders his invocation of *Bumper* inapposite. In *Bumper*, the Court held that consent to search a home based on a false claim that a warrant authorized the search is no consent at all. *Bumper*, 391 U.S. at 549–50 & n.15 (explaining the State never produced the warrant on which officers allegedly relied). Here, the officers produced the warrant to Pierce for inspection, accurately told him the warrant authorized them to compel his biometrics if necessary to open the phone, and asked him to provide the passcode when the biometrics failed to give them access. Put simply, there was nothing misleading about their comments.

Second, Pierce was not compelled—in either the traditional Fifth Amendment sense or as that word is used in the warrant—to provide

the passcode.[8] The concept of a compelled statement more frequently arises when evaluating whether an accused's confession is voluntary. *See McKune v. Lile*, 536 U.S. 24, 35–36 (2002). Impermissible compulsion arises when an accused's statements, under the totality of the circumstances, are the product of government action that overcame the accused's will and "capacity for self-determination." *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006); *see also United States v. Young*, 964 F.3d 938, 943 (10th Cir. 2020).

Impermissible compulsion can occur in a variety of ways. The classic example is physical violence or deprivation. *See, e.g.*, *Berghuis v. Thompkins*, 560 U.S. 370, 386–87 (2010) (no coercion where there was no evidence that police threatened, injured, or otherwise made the accused fearful). But other, more subtle efforts can also be compulsive or coercive. *See, e.g.*, *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011) ("We have repeatedly held that deception and trickery are among the factors that can render consent involuntary.") (Fourth Amendment context). Yet not every ruse or act of trickery will render a confession involuntary. *See, e.g.*, *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); *United States v. Unser*, 165 F.3d 755, 766–67 (10th Cir. 1999); *Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir. 1998); *see also Berghuis*, 560 U.S. at 387 (rejecting argument that invoking religious or morality issues rendered statement compelled).

There are no facts to suggest that Pierce was compelled, impermissibly or otherwise, to provide his passcode. At most, officers highlighted their ability to lawfully collect Pierce's devices and biometric information, created a sense of time pressure, and stated that his provision of the passcode would make the process easier for Pierce and his family. They did not threaten Pierce with adverse consequences—under the warrant or otherwise—if he refused to comply. Instead, they represented that if he declined to provide the passcode, forensic

---

[8] It does not appear that the Tenth Circuit has determined whether the passcode to an iPhone is testimonial information. Pierce cites nonbinding authority from other jurisdictions to suggest a passcode is testimonial, Doc. 31 at 10, and the Government does not dispute that contention. *See* Doc. 37 at 32–34. This Memorandum and Order assumes, without deciding, that Pierce's passcode was the type of information that the Fifth Amendment protects.

examiners would discover it within hours. They simply asked for Pierce's cooperation, and he provided it.

Moreover, there is no evidence to suggest Pierce is someone whose will would be easily overcome. *See Lopez*, 437 F.3d at 1065–66. The full contents of Pierce's interview show him to be an intelligent, capable adult with a full command of the English language, the ability to readily parse questions and instructions, and the presence of mind to make considered responses. The Government has therefore carried its burden of showing that Pierce provided his passcode voluntarily and not as the product of unlawful tactics.

**B**

Even if the officers had unlawfully obtained the passcode from Pierce, he would not be entitled to suppression because the Government has established that it had already obtained the same information from an independent source. Specifically, Pierce's wife, Keelin, provided Pierce's passcode to agents before Pierce did.

The independent-source exception permits the admission of unlawfully seized evidence if the same evidence has been "discovered by means wholly independent of any constitutional violation." *Nix v. Williams*, 467 U.S. 431, 441–44 (1984) (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920)). In other words, it does not salvage evidence obtained in impermissible ways; it merely prevents the exclusionary rule from extending to identical evidence validly obtained by other means. *See id.* at 443–44; *United States v. Griffin*, 48 F.3d 1147, 1150 (10th Cir. 1995). The prosecution bears the burden of showing "that there is truly an independent source for the challenged evidence," meaning that the evidence in question was obtained "by 'means sufficiently distinguishable to be purged of the primary taint'" and never "by the exploitation of the illegality." *United States v. Forbes*, 528 F.3d 1273, 1278–79 (10th Cir. 2008) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

The record confirms that investigators independently obtained Pierce's passcode from his wife, Keelin. The parties agree that the search warrant executed at Keelin's home was valid and that Keelin was not a suspect. The evidence shows that agents expressly informed Keelin that she was free to leave at any time and that when she first indicated she would like to leave, agents immediately honored that

request. Despite that, Keelin spoke to them freely and voluntarily provided the passcode to Pierce's phones.

Moreover, the Government established that Keelin provided the code before Pierce did. The officers credibly testified that had Pierce refused to provide his passcode, Moore would have called Keelin's interviewers, while Pierce's interview was ongoing, to obtain the passcode. In other words, agents would still have gained access to Pierce's phone in real time and would have been able to conduct the same, or sufficiently similar, questioning of Pierce that elicited the inculpatory statements at issue. That is sufficient to satisfy the Government's burden of showing that it independently obtained the same information "by means sufficiently distinguishable" from the allegedly tainted source. *Forbes*, 528 F.3d at 1278.

Pierce argues that the statements Keelin made should be excluded because they too were improperly obtained. He suggests that the general environment of Keelin's interview was coercive and that the agents misrepresented the warrant to Keelin just as they had to Pierce.[9]

That contention also fails. Not only has Pierce failed to establish that the agents misrepresented the warrant to him (or Keelin), but the conversation that agents had with Keelin was also markedly different from the conversation with Pierce. Agents did not reference the warrant when they asked Keelin to provide Pierce's passcode. Nor did they in any way imply a connection between the two. Instead, agents described the warrant as for the home, the vehicles, and Pierce's person. *See* Doc. 39 at 9 ("[F]or your address. Um, looks like we've got some vehicles on there—your van, um, your husband's SUV, and your truck. Um, and then there's a part for your husband's person as well."). Another agent added that the warrant also included "digital media" and told Keelin that officers would need to "look through" all of the

---

[9] The parties were invited to submit briefs concerning Pierce's standing to challenge the circumstances of his wife's interview. The Government submitted a supplemental brief, but that brief did not address the question. Doc. 64. Pierce's supplemental brief indicates that the Tenth Circuit has not confronted the issue, but cites cases from other jurisdictions indicating he does have such standing. Doc. 66 (citing *United States v. Johnson*, 380 F.3d 1013 (7th Cir. 2004); *United States v. Scott*, 270 F.3d 30 (1st Cir. 2001); *State v. Ackward*, 128 P.3d 382 (Kan. 2006)). That issue need not be resolved here because Keelin was not compelled to provide the passcode information.

household devices and would potentially remove some of them from the house. *See* Doc. 39 at 9. The request for Pierce's passcode came separately—several minutes later—when investigators also asked for the couple's birthdates, Social Security numbers, and children's names. Doc. 38-4; *see also* Ex. 104 at 7–8. Unlike Pierce, Keelin did not hesitate when asked for Pierce's passcodes. Nor did she attempt to assert any rights or invoke any privileges on either her own behalf or on behalf of Pierce. Although the situation was no doubt stressful, it was a non-custodial interview, and Keelin herself was not suspected of any crime.

Nor is this a situation where Keelin was especially susceptible to manipulation or otherwise duped into providing the information. The interview occurred in her home, and based on her role as principal of a local school, it can be inferred that she is highly educated, intelligent, and capable of making sound judgments. Based on this record, the Government has sufficiently established that Keelin voluntarily provided the passcode to Pierce's iPhones.

### III

For the foregoing reasons, Pierce's motion to suppress, Doc. 31, is DENIED.

It is so ordered.

Date: November 22, 2021             s/ Toby Crouse
                                    Toby Crouse
                                    United States District Judge