UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No. 5:20-CR-40068-TC-ADM |
| | ) | |
| JEFFREY D. PIERCE | ) | |

## UNITED STATES' SENTENCING MEMORANDUM

*"U got a massive cock for a Sophomore"*
*"Can I suck you off?"*
*"I want to blow you. You want a blowjob? No strings attached"*
*"Lemme see those hot pubes"*
*"Put your finger in your butthole."*
*"Send vid jacking off. Get face, body, dick and balls and ass"*
-- Jeffrey Pierce to multiple boys ages 14-17

### I.    Introduction

The United States requests a sentence of thirty (30) years for this defendant who preyed on young boys in the same school in which he was entrusted to be a guardian and mentor to these children.

### II.    Procedural History

On December 9, 2020, a Grand Jury issued a Superseding Indictment, charging Defendant with production of child pornography in violation of 18 U.S.C. § 2251 (Counts One through Nine), distribution of child pornography in violation of 18 U.S.C. §2252 (Count Ten), possession of child pornography in violation of 18 U.S.C. §2252 (Count Eleven), and coercion and enticement of a minor in violation

of 18 U.S.C. § 2422(b) (Count Twelve). On January 21, 2022, Defendant pled guilty to Count 2 of the Superseding Indictment, specifically stipulating that "the defendant agrees that the conduct charged in any dismissed counts, as well as all other uncharged related criminal activity, will be considered as relevant conduct for purposes of calculating the offense level." (Plea Agreement ¶ 4.) Defendant is presently scheduled for sentencing on Thursday, September 22, 2022.

## III.    Factual Background

On June 5, 2020, an agent from the Federal Bureau of Investigations (FBI) spoke with a mother (Witness 1) over the phone. Witness 1 advised that her 14-year-old son had been contacted by an unknown individual on Instagram using the account "Addie8651." Because her son did not recognize the individual or the account, he did not respond. Defendant Jeffrey Pierce was in fact "Addie8651".

Pierce, a 40-year-old man at the time, was pretending to be a 16-year-old girl and soliciting sexually explicit images from minors. Both Witness 1 and her son believed the Instagram account was fake. Witness 1's son later learned that two of his minor friends had also been contacted by Pierce using the same Instagram account. One of the friends disclosed that he took and sent sexually explicit images of himself to the Addie8651 Instagram account, and that Pierce threatened to post or distribute the images he already had of the minor if he did not send additional

2

sexually explicit images. Witness 1's son informed Witness 1 of his friend's situation, and Witness 1 advised that the minor tell his parents what was going on.

Upon being made aware of the minor's situation, Witness 1 located and viewed the publicly available information for the Addie8651 account. Witness 1 observed the user of the Instagram account was "friends" with or was being "followed" by approximately 1,900 other Instagram users. Witness 1 confirmed most of the "friends/followers" appeared to be juvenile males. While reviewing the list of friends and followers, Witness 1 observed the name and Instagram accounts of numerous juvenile males whom she recognized as residing in the Topeka, Kansas area.

On June 8, 2020, the FBI interviewed the minor, who Pierce had attempted to blackmail, about the Addie8651 Instagram communications. The minor stated the user of the Addie8651 account portrayed themselves as a 16-year-old female living in Kansas City, Kansas and that the user was friends with, or was being followed by, other minors who he knew personally. The minor confirmed he sent nude images of his penis and buttocks to the Addie8651 Instagram account. Pierce had also requested a video of the minor masturbating. The minor complied and sent the requested video to Pierce. The minor was 14 years old at the time he sent the images and video to Pierce. Pierce told the minor he was exchanging pictures with other users as well. The minor also disclosed that Pierce sent the minor a video of a female

3

masturbating with a comb and other images of females, including a picture of a female's vagina. The minor confirmed that once he declined to send additional sexually explicit images to Pierce, Pierce threatened to post or distribute the minor's sexually explicit images.[1] After confiding in his parents, the minor's mother, Witness 2, reviewed the Addie8651 Instagram account. She recognized numerous Instagram accounts that were friends with or following the account and that appeared to belong to other minors around her son's age who lived in the Topeka area.

After receiving the above information, law enforcement obtained a search warrant for the contents of the Addie8651 Instagram account. The account information provided by Instagram contained a registration IP address, along with many other IP addresses used by the account and a verified phone number, which was in fact Pierce's phone number. The company explained that for a user to "verify" a phone number, they must have responded to a text message sent to the listed number. Furthermore, additional investigation revealed that the IP addresses used by the account resolved to Pierce's residence in Topeka. The records showed the current username on the account was Addiestrode111, but that a previous username of Addie8651 had been used.

---

[1] Law enforcement's review of these messages revealed that Pierce also attempted to extort this minor into convincing his friend to send Pierce sexually explicit images in exchange for Pierce not posting or further distributing the minor's images.

A review of the messages from the Addie8651 Instagram account revealed communications between the account user and multiple minors wherein the account user solicited the minors to produce sexually explicit images and videos of themselves. Indeed, the records revealed the account was mainly used to solicit sexually explicit images and videos from minor males.

After reviewing the Instagram search warrant returns showing the Addie8651/Addiestrode111 account was mainly used to solicit sexually explicit images and videos from minor boys, and after obtaining information linking the account to Jeffrey Pierce, law enforcement obtained a search warrant for Pierce's residence, vehicle, and person.

### *Statements Made by Pierce During His Mirandized Interview*

On September 2, 2020, law enforcement executed the warrant and conducted an interview of Pierce. In response to questions, Pierce stated the following, much of which law enforcement determined to be minimizations of Pierce's criminal conduct or outright falsehoods based on additional investigation.

Pierce stated that he opened an Instagram account about three or four years ago. When Pierce originally opened the account, he used his real name. During that time, he did not use Instagram regularly. About a year and a half ago, Pierce changed his Instagram account name to that of a female, which he was still using. Pierce confirmed the current name on the Instagram account was Addiestrode111. Pierce

was shown the profile picture for the Instagram account of Addiestrode111, depicting a blonde female. Pierce confirmed the picture was of his Instagram account, and that he had been using the account name and profile picture since at least March 2020. Pierce made up the name Addie Strode, and the biographical information associated with the account was also fake.

Pierce further stated that he was on Instagram one to two times per week chatting with males and females. Pierce's activity on Instagram increased in March 2020 due to the Covid-19 pandemic. Pierce used Instagram to "troll" the internet, looking for local people with whom he could chat and possibly exchange sexual pictures and/or videos. Pierce confirmed he did this for sexual gratification. Pierce posed as a male and female, and communicated with both males and females. Pierce initially indicated he posed as an adult, but later stated he posed as a 16- or 17-year-old.

Pierce also admitted that he is attracted to people younger than him. In his interview, Pierce lied, claiming he only talks to individuals who are at least 18 years old, and he knows their age because he always asks how old they are when they begin communicating. (A statement he later contradicts while admitting he targeted children in the high school where he worked.) In the past, Pierce asked the people he chatted with whether they were gay or bisexual, and whether they were curious or interested in being with another male. After chatting with someone for an

6

unspecified period, Pierce requested nude images or videos from the other individual. Regarding the types of sexually explicit images or videos he requested, Pierce indicated he asked for "anything they would send." The week prior to his interview, Pierce contacted someone on Instagram and requested sexual pictures from them. Pierce did not save the images and videos he received because he did not want his wife to find them.

Pierce was asked about one particular identified minor, whom he chatted with on Instagram. Pierce indicated he was very familiar with the 16-year-old minor and that he had personally known the minor since his freshman year. He further stated he met with this minor in the summer of 2020, though he claimed the meeting was not sexual in nature. Pierce was aware this minor was having struggles in his personal life. In the spring of 2020, Pierce saw a post the minor made on Instagram. Using the Addiestrode111 account, Pierce contacted the minor and pretended to be an underage female. Pierce requested and received two or three images of the minor's genitalia, and three videos of the minor masturbating.

Pierce indicated that chatting with people online and exchanging sexually explicit images or videos was a "thrill" for him and he was addicted to it. Pierce stated that he did not regularly receive sexually explicit images and videos from individuals under the age of 18 years old. Pierce estimated he had only received this type of content from five or fewer individuals who were not yet adults. This, of

course, was yet another bold lie by Pierce. Pierce denied masturbating to the images or videos he received. Pierce was shown a list of other Instagram usernames and denied recognizing them as individuals with whom he had communicated.

Pierce was shown several images he had shared with various minors on Instagram which he portrayed to be of his online persona, Addie Strode. These pictures were provided in the Instagram search warrant return information. Pierce confirmed he pulled the pictures from the internet. Pierce used a variety of social media including, Facebook, Twitter, Instagram and Snapchat. Pierce also used Kik several years ago.

### *Additional evidence found*

Located on a thumb drive discovered in Pierce's classroom were over 6,000 images and over 1,500 videos of possible child pornography. The images depicted young males masturbating and displaying their penis; boys changing in what appear to be the locker rooms at the school where he worked and another school in the Topeka area; screenshots of social media accounts used by the boys in the other images and some clothed photos of boys. The videos likewise depict boys masturbating. Over 700 screenshots of social media accounts that displayed usernames were located.

After examining Pierce's devices, law enforcement submitted over 15,000 images and videos to the National Center for Missing and Exploited Children

("NCMEC") for identification, but many of the images were unknown, meaning NCMEC did not already have the files in their database. This often happens in cases in which the defendant was the producer of new images, as Pierce was here.

As outlined in the PSR, law enforcement has identified at least 81 victims as having been victimized by Pierce to date.

## IV.    The Sentencing Guidelines

The recommendations of the Sentencing Guidelines are no longer mandatory, but sentencing courts "must consult these Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). The Sentencing Guidelines are "the 'starting point and the initial benchmark.'" *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007) (noting that the Guidelines should "be kept in mind throughout the process")).

The United States maintains its objections to the Guidelines calculation contained in the revised Presentence Investigation Report, ("PSR," Doc. 86 at ¶¶ 302–311), which ignores Defendant's admission in his plea agreement that conduct charged in any dismissed counts and all other uncharged related criminal activity constitute relevant conduct to Count 2 under the Guidelines. Defendant's admission is consistent with Tenth Circuit authority, which explains that courts should take a broad view in determining what constitutes relevant conduct when applying

U.S.S.G. § 2G2.1. *See United States v. West*, 576 F. App'x 729, 733–34 (10th Cir. 2014) (considering temporal and spatial connection in determining relevant conduct under § 2G2.1); *see also United States v. Asch*, 207 F.3d 1238, 1243 (10th Cir. 2000) ("This Circuit has construed broadly the meaning of relevant conduct."). And here, the conduct described above and in the PSR makes clear that Pierce's modus operandi was to impersonate a minor female online and connect with minors in his community over social media, allowing him to establish false relationships with the minors and induce the production of child pornography, both of which he would then use to ensnare future victims. Pierce's predation on the many children listed in the PSR was thus not a sampling of discrete episodes of a common pattern or practice, but rather a series of inextricably linked and overlapping steps in the same criminal offense—one in which each act of inducement was both "in preparation for" those that followed it (*see* U.S.S.G. § 1B1.3(a)(1)(A)) and a "harm that resulted from" those that preceded (*see* U.S.S.G. § 1B1.3(a)(3)).

The PSR ignores this obvious spatial, temporal, and factual connection between the Defendant's exploitation of various minors, opting instead to focus on the single minor identified in Count 2 despite the Guidelines' commentary to do the opposite. *See* U.S.S.G. § 2G2.1, Note 7. Adopting this approach will lead to absurd results, both in this case and future cases. Indeed, imagine a scenario in which a defendant lures a minor into his home under false pretenses, uses that minor's

presence to lure the minor's two friends over, and then simultaneously produces child pornography of the three minors while they're in separate rooms. If that defendant were to plead guilty to a count of production of child pornography involving just one minor—while fully admitting that his exploitation of the other minors was relevant conduct to his offense of conviction—the approach in the PSR would advise that the defendant's exploitation of the other minors was not relevant conduct that was done in preparation for or resulted from his conduct of conviction under the Guidelines. That outcome would, of course, make no sense given the facts, nor does it suddenly make sense if the defendant admitted to engaging in the same exact scheme on a significantly larger scale over the internet. Accordingly, while the government acknowledges that its objection will not alter the Guidelines recommendation in the PSR, which is the maximum recommendation permitted by statute, it nevertheless notes its objection based on the specific facts of the case and the Defendant's stipulations and admissions in his plea agreement.

## V.    The United States' Recommendation is Reasonable and Necessary to Comply with § 3553(a)

After calculating the recommended sentence using the advisory Sentencing Guidelines, the Court must then apply an individualized assessment under the statutory sentencing factors set forth in 18 U.S.C. § 3553(a). *United States v. Boulware*, 604 F.3d 832 (4th Cir. 2010). These factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B) to afford adequate deterrence to criminal conduct;

   (C) to protect the public from further crimes of the defendant.
….

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct

18 U.S.C. § 3553(a).

Here, the Sentencing Guidelines for Defendant recommend 30 years of imprisonment, and the facts of this specific case, when combined with the history and characteristics of the Defendant, all support that recommendation of imprisonment.

## A. The Nature and Circumstances of the Offense

Defendant's criminal conduct is extremely serious and demands an appropriately stringent sentence. He targeted a population that is the most vulnerable in our society: children. He manipulated his victims into a situation where they sent him images they never would have sent had they known they were talking to "Coach Pierce." He was a wolf in sheep's clothing, using the honor of teaching and the moral uprightness of a religious man to groom the parents of children around him to give

12

him access to their children so that he could learn about their lives and vulnerabilities—information that he would promptly use to exploit them online for the sole purpose of sexually gratifying himself at their expense. He also used fear and intimidation in an attempt to dissuade the children from reporting his crimes, and to get them to continue feeding his insatiable appetite for sexual imagery of children.

## B. History & Characteristics of the Defendant

Many defendants involved in other federal crimes, such as drug and gun offenses, have dire family life circumstances that lead them to the all-too-predictable path of crime. The defendant in this case experienced the antithesis of that lifestyle. Pierce was raised in a stable home, in which his parents have been married for over 50 years. His father was a veterinarian and a youth sports coach, and his mother was a special education teacher in the Topeka Public School District. Pierce also has close relationships with his siblings, one of whom is an elementary school teacher. Pierce reported to U.S. Probation that he had a carefree childhood, free from abuse and neglect. He further stated that he played youth sports and his father coached everything. Pierce also reported strong religious faith and connection to a Lutheran church in Topeka.

Pierce grew up in Topeka, graduated from Topeka West High School in 1999, and went to college at Kansas State, where he got his degree in secondary education,

13

history, and geography. Additionally, Pierce obtained his master's degree in educational administration at Washburn University. At the time of his arrest, Pierce was gainfully employed as a teacher for the prior 18 years, the last 9 of which were at Seaman High School, where he taught world history and coached the boys' basketball, cross country, and track teams. Furthermore, Pierce was a homeowner, living with his wife—also an employee at a school in Topeka—and children in the same residence for the last 10 years.

While committing these crimes, he had a comfortable residence, a steady job, sufficient financial resources, and a stable support structure in the form of his wife, children, parents, and siblings. Yet, he committed these egregious crimes by deceiving those around him into believing he was a trustworthy teacher, coach, neighbor, and friend. In other words, he was not lured or coerced through unfortunate circumstances to this life of crime. Instead, he raced down the path of his own volition and with full knowledge of what he was doing. If anything, the history and characteristics of this defendant militate in favor of increased punishment, not against it.

Every individual faces challenges in their life, some more severe, some less severe. But no challenge excuses or mitigates the types of vile offenses committed by Defendant. The victims of his crimes—children in his orbit (some in his care as a teacher and coach) exploited in visual and psychological ways—are the ones who

14

experience challenges beyond imagination. On balance, the history and characteristics of Defendant make clear that he has had a supportive upbringing, lived a stable life with a strong family network, and had adequate education and financial resources to live a law-abiding life. He was not corralled into this crime by a series of unfortunate life circumstances. Rather, he chose his path. His sentence should reflect those facts.

## C. The Seriousness of the Offense and the Need to Promote Respect for the Law and Provide Just Punishment

There can be no question that the Defendant's offenses are among the most serious under the law. As a consequence of being victimized by Defendant, these children are now at an increased risk of falling prey to alcohol abuse, illicit drug use, and suicide. Research in this area is startling and demonstrates the need for a significant punishment.

In the late 1990s, the Kaiser Permanente San Diego Health Appraisal Clinic, a primary care clinic where more than 50,000 adult members of an HMO receive medical examinations, began a study to examine the long-term relationship between Adverse Childhood Experiences (ACEs) and a variety of health behaviors and health outcomes in adulthood. First, they took a survey of adults who were members of the Kaiser HMO to determine the number of ACEs experienced. An ACE was defined to include an experience occurring to the adult before the age of 18 such as verbal

abuse, physical abuse, contact sexual abuse, a battered mother, household substance abuse, household mental illness, incarcerated household members, and parental separation or divorce. The survey data was collected in 1995 through 1997.

In early 2009, using the National Death Index mortality data, researchers analyzed how many of the 17,337 original survey respondents were deceased 10 years after the survey. The results were startling. "People with six or more ACEs died nearly 20 years earlier on average than those without ACEs." David W. Brown, et al, *Adverse Childhood Experiences and the Risk of Premature Mortality*, 37 American Journal of Preventive Medicine 389-96 (2009). In other words, if a person in the control group lived to 79.1 years old, that same person will only live to age 60.6 years old if she experienced six or more ACEs before the age of 18.

While it is certainly alarming to know that serious negative experiences in childhood could be correlated with such a precipitous drop in life expectancy, the ACE Study expressly observed that "[t]here are several reasons to believe that these estimates of the relationship between ACEs and premature death are *conservative*." (*Id*. at 394 (emphasis added).) Indeed, when the initial survey was conducted in 1995 to 1997, approximately 60% of the survey respondents were already 50 years or older. Given that fact, "it is reasonable to postulate that people who are exposed to ACEs (particularly multiple ACEs) are more likely (compared to those who are unexposed) to be aborted; die during childhood or young adulthood; be

16

institutionalized; or be otherwise lost prior to the initiation of the ACE Study." (*Id.* at 394-95.) In other words, the ones who lived long enough and thrived well enough to be available for the HMO study were the most resilient of those who had experienced 6 or more ACEs; *yet even that resilient group experienced a premature mortality of 20 years.* In addition, the survey respondents were of a population who were enrolled in a major health plan at that time, i.e., "predominantly white, middle-class adults." (*Id.* at 394.)  Due to these facts about the survey population, "the association between ACEs and premature all-cause mortality would be biased downward." (*Id.* at 395.)  In other words, it is reasonable to conclude that an ACE victim's risk of premature mortality is even greater than the ACE Study results show.

Additional research using the same survey data has drilled deeper to better understand the relationship between the severity of the childhood *sexual* abuse (not just adverse childhood experiences) and the long-term health and social problems. *See* Shanta R. Dube, et al, *Long-Term Consequences of Childhood Sexual Abuse by Gender of Victim*, 28 American Journal of Preventive Medicine 430-38 (2005). First, Dube's study bifurcated the population of sexual abuse victims by classifying them into "sexual abuse, no intercourse" and "intercourse." Intercourse was defined as answering yes to the question of whether any "adult, relative, family friend, or stranger ever" attempted or actually had "any type of sexual intercourse with you (oral, anal, or vaginal)."

Using those definitions and categories, the study showed that adult men who were sexually abused in the form of intercourse as a child, were 240% more likely to attempt suicide than men who had never been sexually abused as a child. *See id*. at 432, Table 4. Equally unsettling was that even the children who experienced non-intercourse sexual abuse (so-called "just fondling") were **80% more** likely to attempt suicide than those who had never been sexually abused. Sadly, this data set does not (because it cannot) include *actual* suicides, which undoubtedly would increase the odds described in the study. In addition to suicide risk, intercourse male child sexual abuse victims were **80% more** likely to use illicit drugs ("street" drugs, e.g., meth, heroin, cocaine), and 50% more likely to have alcohol problems. *See id*.

Section 3553(a)(2)(A) instructs this Court to fashion a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide *just punishment* for the offense." (emphasis added). The scientific articles interpreting the ACE Study very clearly demonstrate the profound long-term consequences of various kinds of adverse childhood experiences, especially childhood sexual abuse. For Defendant's victims, who were exploited by him, they now have a significantly increased risk of attempting suicide, using illicit drugs, and having alcohol problems. Finally, there is an increased chance that they will die nearly 20 years early. In short, by using these victims as sexual objects for his own base gratification, Defendant

18

has forever impacted their lives in ways that have significant long-term health consequences.

Defendant robbed these boys of their innocence. There is no telling what damage he has ultimately caused, and whether they will ever be able to live productive, healthy lives. A significant sentence of imprisonment would therefore be both reasonable and appropriate—"just punishment" in the terms of § 3553(a)—given the lifelong consequences that these victims will likely experience due to Defendant's reprehensible acts.[2]

### D. The Need for Adequate Deterrence & Protecting the Public

Both specific and general deterrence call for significant sentences above the mandatory minimum to send a message that engaging in repeated sexual abuse of children that causes extensive harm, and producing visual depictions of that abuse, will result in a federal prison term that takes one far into old age, if not an effective life sentence. A long sentence is also necessary to minimize the risk of harm to the public lest this Defendant return to society at an age where his physical functioning and predilections enable continued inappropriate sexual behavior. Indeed, if the best predictor of sexual recidivism is the age of the defendant (i.e., the younger upon

---

[2] The United States has received a number of victim impact statements from those harmed by the Defendant's years of sexually exploitative conduct and intends to present these statements to the Court at sentencing to ensure that those victimized by Pierce have an opportunity to be heard, as required by 18 U.S.C. § 3771.

19

release, the more likely to commit a new sexual crime), then the corollary is also true: The older upon release, the less likely to commit a new sexual crime. Therefore, a significant sentence is the single best way to prevent this Defendant from committing new sex crimes against children.

The risk Defendant poses to children is immense. "An analogy often used in the field may make this question easier to answer: How many people who collect baseball cards have also played the game (or would play, if given the opportunity)? In other words, do the things we collect reflect our fantasies and interests? An answer in the affirmative seems obvious." *Handbook of Behavioral Criminology*, p. 332, edited by Dr. Vincent B. Van Hasselt and Dr. Michael L. Bourke, Springer Intl. Publishing (2017). Likewise:

> A similar analogy addresses online collecting behavior and involves people who download images and videos about trout fishing. How many have spent time in the water with a rod and reel? Perhaps not all, but surely most. Equally important, how many of the people who watch fishing videos engage in fantasy while watching them? And this is the key point: When they view fish being pulled from scenic mountain streams, are they fantasizing about the next time they will be able to *watch* a fishing video, or the next time they will have the opportunity to *hook* a trout? It seems clear we view and collect things that reinforce our fantasies, and we fantasize about things we would like to do.

*Id*. (emphasis added). Here, Defendant collected trophies in the form of sexually explicit images of boys in his school and this community. His desires were not limited to merely fantasizing about the next time he would convince another boy to

20

send him explicit images. On the contrary, Defendant was keenly interested in manipulating any boy he could to migrate from online sexual behavior to sex acts with Defendant in person.

Indeed, with regard to one victim (identified as V1 in the PSR), Pierce, after having received sexually explicit images of the boy and while still pretending to be a teenage girl, attempted to introduce "her" friend Jeff. Defendant was actively trying to introduce himself into the situation in a very real way so that he could meet this boy and engage in sexual activity with him. Pierce eventually began communicating with the boy as himself, and became even more direct and explicit: "Can I suck you off??" "I want to blow you. You want a blowjob? No strings attached," "Just gotta meet. I'll do it in a car." "Let's meet," "Tmrw????" "U down??" (PSR ¶ 71.) When confronted with these messages, Pierce admitted to law enforcement that he was saying these things because he wanted V1 to meet him for sexual activity. Thus, the public has a right to be protected from this defendant who has demonstrated an unequivocal desire to engage in sexual activity with young boys.

To the extent Defendant argues that a sentence near the minimum would be "sufficient, but not greater than necessary" because such sentence would take him into his mid-50s, the reality is that even if Defendant were imprisoned long enough that he would be *less likely* to commit sexual assaults on children, scholarly research

21

in this area demonstrates that sexual predators like Defendant will simply change

their *modus operandi*:

> Generally, older sex offenders engage in more passive sexual activity as compared to their younger counterparts. For example, fondling by elderly offenders is more prevalent than intercourse. Research has shown that elder offenders are more likely to commit 'nonviolent' sexual offenses such as pedophilia or exhibitionism as opposed to 'violent' offenses such as forcible rape. Specific examples of these 'nonviolent' offenses include improperly touching an acquaintance, statutory rape, exposing of the genitals (usually to a minor), and other acts of exhibitionism.

Matt Hart, *The Geriatric Sex Offender: Senile or Pedophile?*, 32 Law & Psychol.

Rev. 153 (2008).

Moreover, there are dozens of examples of defendants over the age of 60 who

have been sentenced in federal court for the production of child pornography.

Gordon Elton Hayes was 60 years old when he produced child pornography of three

minor victims in Alabama. *United States v. Hayes*, 4:07-cr-62 (N.D. Ala.) (sentenced

to 3,720 months). Benton Stong was 74 years old at the time he produced child

pornography involving 10- to 12-year-old victims in Iowa. *United States v. Stong*,

6:13-cr-214 (N.D. Iowa) (sentenced to 1,320 months).

There are also plenty of examples of older defendants who re-offended even

after serving prison sentences. Jerry Lee Hendricks was 66 years old when he was

convicted of producing child pornography of one victim in Illinois after previously

being convicted in South Carolina (Chesterfield County and Darlington County) of

"Lewd acts on a child under 16" when he was 56 years old. *See United States v. Hendricks*, 12-CR-20025 (C.D. Ill. June 26, 2014). Other examples abound. *See United States v. McGee*, 10-CR-162, Doc. No. 71 (S.D. Ala. Mar. 3, 2011) (62-year-old defendant sentenced to life for production of child pornography following prior sex conviction); *United States v. Pavulak*, 09-CR-43, Doc. Nos. 1, 120, 121 (D. Del. Oct. 14, 2011) (67-year-old defendant sentenced to life for production of child pornography following prior sex conviction).

The bottom line is that people are living longer, the quality of health care in the Bureau of Prisons is better than some inmates would receive outside of prison, and the sexual attraction to children is a life-long problem that will not magically go away at a certain advanced age. Accordingly, attempts to speculate into the future about this Defendant's physical abilities to act on his life-long desire to have sex with children when he is in his 50s or 60s are just that: speculation. Absent additional information about this defendant's actual health situation at that time, this Court cannot (and should not) adjust its sentence based upon the arbitrary assertion that people in their 50s are less likely to offend against children.

**E. The Need to Avoid Unwarranted Sentencing Disparities**

This Court has no doubt encountered cases involving the production of child pornography. The facts of this case, however, are remarkable in their depravity. Defendant manipulated the children (and their parents, and his fellow teachers) so

23

that he could isolate them in an online environment to give him unfettered access to sexually offend against them. He executed his plan after obvious planning. It was utterly diabolical.

There are examples of (arguably) less severe cases in the District of Kansas in which defendants received sentences even that were more severe than being requested by the United States in this case. In 2020, in *United States v. Daniel Eric Merida*, 18-CR-10157, Judge Broomes sentenced a 35-year-old man to 600 months (50 years) for production of child pornography involving one minor victim. In 2019, in *United States v. Anthony Shultz*, 16-CR-10107, Chief Judge Melgren sentenced a 55-year-old man to 1,013 months (84+ years) for production of child pornography involving 3 victims ages 8, 12, and 15. In 2013, in *United States v. Philip Grigsby*, 12-CR-10174, Judge Marten sentenced a 50-year-old man to 3,120 months (260 years) for production of child pornography involving one victim. Indeed, Judge Marten noted at the time of sentencing that "there are people who spend . . . their entire lives as a result of experiences that they had as children, and there is no way that any amount of therapy can guarantee any kind of reasonable outcome." (Sent. Tr., Doc. 88 at 22:23 to 23:2.)

In addition to the cases cited from the District of Kansas, there are multiple examples from around the country of defendants who were similarly situated and who received sentences even greater than what the United States is requesting here.

24

Specifically, the chart below shows federal cases from all over the country, between 2008 and 2020 (latest year of data), in which a defendant was sentenced to 50 years or more for production of child pornography involving the following similar facts: (1) Defendant's age was between 35 and 45; (2) Victims were older than 12; (3) Offense was primarily online (instead of in person contact offense). Note that most of the defendants below received their sentence despite having no prior conviction for sexual abuse of a child. Furthermore, most of the below cases involved only one victim, not the dozens target by Defendant in this case.

| District | Defendant's Name | Court Number | Sentence Date (Yr-Mo-Day) | Prison Time (Months) | Defendant's Age |
|---|---|---|---|---|---|
| ALN | Culver, Brian Scott | 07-CR-00009 | 2007-10-26 | 720 | 44 |
| ARW | Cannon, William | 10-CR-50108 | 2012-02-01 | 840 | 45 |
| ARW | Chappell, Jr., Daniel | 07CR50074-001 | 2008-11-18 | 720 | 43 |
| ARW | White, Arthur | 09CR30001 | 2009-06-24 | LIFE | 44 |
| FLM | Blage, Kenneth | 09-CR-00584 | 2010-09-01 | 720 | 41 |
| FLM | Dillon, Chad Theodore | 16-CR-00112 | 2018-01-26 | 5760 | 45 |
| ILC | Shannon, Shawn | 15-CR-20014 | 2017-09-12 | 720 | 45 |
| ILS | Courtright, Carl | 07-CR-30179 | 2009-07-24 | LIFE | 37 |
| KS | Merida, Daniel Eric | 18-CR-10157 | 2020-02-18 | 600 | 35 |
| MOW | Smith, Todd C. | 11-CR-05044 | 2012-12-21 | LIFE | 40 |
| ND | Daigle, Brent | 16-CR-00013 | 2018-12-19 | 840 | 39 |
| ND | Bjornstad, Brandon Lee | 17-CR-00210 | 2019-11-20 | 720 | 35 |
| NH | Goergen, Ronald | 10-CR-00117 | 2011-01-20 | 720 | 35 |
| NJ | Wares, Clifford | 15-CR-00570 | 2016-07-08 | LIFE | 43 |
| PAE | Flores, Jose R. | 17-CR-00412 | 2020-03-30 | 840 | 41 |

| PAM | Walpole, Brian William | 10-CR-00340 | 2012-08-03 | 600 | 43 |
|---|---|---|---|---|---|
| RI | Gaccione, Jay S. | 17-CR-000004 | 2019-06-28 | 2160 | 41 |
| SD | Chase Alone, Henry | 18-CR-50117 | 2019-12-22 | 900 | 36 |
| TXN | Ables, Robert Dion | 17-CR-00038 | 2017-07-07 | 960 | 39 |
| TXN | Buck, Shannon | 14-CR-00354 | 2016-09-21 | 720 | 43 |
| TXN | Ables, Robert Dion | 17-CR-00038 | 2017-07-07 | 960 | 40 |
| TXW | Carmony, Charles Wayne | 08-CR-036 | 2009-02-24 | LIFE | 44 |
| TXW | Simmons, Gemase Lee | 12-CR-00108 | 2013-08-12 | 5760 | 36 |

As the above charts make clear, the United States' request, along with Probation's recommendation, is commensurate with a large number of cases from different jurisdictions where very similarly situated defendants were sentenced for similar conduct. Therefore, a sentence of thirty years, would not result in a sentencing disparity.

## VI.   A Lifetime of Supervised Release Is Reasonable and Appropriate

Regardless of the term of imprisonment, this Court should impose a term of supervised release that extends for the life of the defendant. "Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Supervised release is not a punishment in lieu of incarceration. *See United States v. Granderson*, 511 U.S. 39, 50 (1994). If being on supervised release were the punitive equivalent of being in prison, and if it served the just desserts function, there would be no need to put most criminals in

prison. *See United States v. Irey*, 612 F.3d 1160, 1210 (11th Cir. 2010). The life term recommendation contained in Section 5D1.2(b) is evidence that recidivism rates for sex offenders do not appreciably decline as offenders age. *See* H.R. Rep. No. 107-527, at 2 (2002) (discussing the merits of a life term of supervised release for sexual offenders); *see also supra* (discussing defendants over the age of 60 who have committed similar federal child exploitation crimes). Because, in sex crimes cases, there is no reason to believe that the need for supervision inherently decreases with time, Congress found lifetime supervised release to be appropriate, and thus directly inserted such a recommendation into the Guidelines. *See id*. More specifically, the passage of 18 U.S.C. § 3583(k) recognized the long-standing concerns of federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders, particularly for the perpetrators of child sexual abuse crimes, whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison. Many of these offenders need long term or lifetime monitoring and oversight. *See* H.R. Conf. Rep. No. 108-66, at 49-50 (2003), *reprinted in* 2003 U.S.C.C.A.N. 683, 684. A term of supervised release for life is reasonable and appropriate in this case to achieve rehabilitative ends and to protect children from further victimization.

## VII.  Conclusion

This Court has the opportunity to bring security to the community—here in Topeka, and in the larger community of America—by ensuring that children do not have to worry about being targeted by a predator like the Defendant for a significant portion of his life. This Court also has the opportunity to provide the survivors of Defendant's depravity with a chance at peace and closure by imposing a total punishment so that the Defendant may never harm them again.

The evidence shows that Defendant engaged in this depraved sexual abuse of children for several years between 2015 and 2020. But in doing so, he gave these victims a lifetime of trauma and hardship. Forevermore, these victims will have to face embarrassing, stressful, and awful conversations with their families, friends, people they date, and maybe someday, their own kids. Because to know them, is to know all of them; and to know all of them, they must relive the trauma this defendant inflicted upon them by sharing that experience with their loved ones. It is one of the burdens that Defendant saddled these victims with for the rest of their lives. Their victimization is an albatross of anxiety that cannot be buried, but instead must be shouldered by these victims until they are each laid to eternal rest. Their lives are forever changed in the most profound ways. And this Defendant's life should be changed as well: By spending 30 years of his life behind bars, while the victims

suffer a lifetime of emotional and psychological imprisonment for the things he did to them.

Respectfully submitted,

/s/ *Austin M. Berry*
Austin M. Berry
Trial Attorney
Child Exploitation & Obscenity Section
Department of Justice
1301 New York Avenue, NW
11th Floor
Washington, DC 20005
Email: Austin.Berry2@usdoj.gov

/s/ William G. Clayman
William G. Clayman
Trial Attorney
Child Exploitation & Obscenity Section
Department of Justice
1301 New York Avenue, NW
11th Floor
Washington, DC 20005
Email: william.clayman@usdoj.gov

# CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2022 I filed **UNITED STATES'
SENTENCING MEMORANDUM** with the Clerk of the Court; such filing to be
made to the following:

by electronic filing:

Christopher Joseph

and I hereby certify that I have mailed by United States Postal Service the
document to the following non-CM/ECF participants:

**NONE**

/s/ Austin M. Berry
Austin M. Berry
Trial Attorney

30